Filed 2/24/22  P. v. Valdez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C087046 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F05956) |
| v. | |
| MOSES VALDEZ, | |
| Defendant and Appellant. | |

A jury found defendant Moses Valdez guilty of murder in the first degree and found a firearm enhancement true.  Defendant killed the victim, his fiancé, in her apartment by shooting her in the head and by strangling her with multiple ligatures. He was sentenced to 100 years to life.

On appeal, defendant asserts the trial court prejudicially erred in:  (1) admitting expert and video evidence regarding cell tower coverage areas that was based on scientific techniques not generally accepted by the relevant scientific community under

1

*People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and inadmissible under Evidence Code sections 801 and 802;[1] (2) admitting video evidence mapping cell phone activity which constituted inadmissible hearsay and violated his rights under the confrontation clause; (3) admitting (a) testimony concerning defendant's gang affiliation, (b) testimony concerning two witnesses' beliefs that defendant had killed two people in the 1990's, and (c) a text message defendant sent the victim's husband which included a racial slur; (4) failing to control a witness's emotional outbursts; (5) refusing to give defendant's proposed pinpoint instruction on third party culpability; and (6) granting the prosecution's request to amend the information, after the jury had been discharged, to change the dates of two prior convictions, thus purportedly depriving him of his right to trial by jury on the prior conviction allegations.

We conclude defendant forfeited his *Kelly* and sections 801/802 objections because he did not make them in the trial court. Anticipating this conclusion, defendant asserts that trial counsel's failure to make these objections amounts to constitutional ineffective assistance of counsel.

We reject defendant's ineffective assistance of counsel claim. The burden of establishing ineffective assistance is on defendant, and an appeal is a poor vehicle for advancing *Kelly* and sections 801/802 claims. We reject defendant's attempt to do so by providing a one-sided presentation, citing a number of articles concerning a lack of general acceptance in the scientific community that were not introduced in the trial court. *Kelly* contemplates expert testimony and submission of published materials and requires a particular showing by the prosecution in the trial court. Consequently, we decline to address defendant's ineffective assistance of counsel claim by ruling on the merits of *Kelly* and sections 801/802 objections made for the first time on appeal.

---

[1] We shall refer to these Evidence Code provisions as sections 801/802 collectively and section 801 and section 802 when referring to them individually.

And we conclude that, because of the other evidence establishing defendant's whereabouts and complicity, even if counsel's failure to object could be viewed as constitutionally deficient performance, defendant has not shown prejudice. Accordingly, not only are defendant's *Kelly* and sections 801/802 claims forfeited, but defendant has not carried his burden showing constitutionally ineffective assistance of counsel.

As to defendant's hearsay contention, we conclude that even if the video mapping evidence showing cell phone activity and coverage areas was hearsay, the error was harmless given the other evidence establishing defendant's whereabouts and complicity.

As to defendant's other contentions, we conclude they are forfeited, without merit, and/or defendant was not prejudiced as a result of any errors. We will modify the oral pronouncement of judgment to reflect the imposition of a court operations assessment fee and a criminal conviction assessment fee not orally imposed.

Otherwise, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution Evidence

### Events Leading to the Discovery of the Victim's Body on November 5, 2014

Jose was married to the victim.[2] They had two children together. However, by November 2014,[3] they did not live together and the victim had moved into a three-bedroom apartment in Elk Grove. Jose believed that the victim was dating someone else.

---

[2] Throughout this opinion we refer to the victim as such because of the uniqueness of her name and using her initials under California Rule of Court, rule 8.90 is problematic. Also, we use the first names of other people and witnesses. In other instances, we refer to individuals by their familial relationships to others. In still other instances, we refer to witnesses by their initials. In some cases, we take these steps because a number of defendant's family members share the same last name. In other cases, we employ this style in the interest of protective nondisclosure.

[3] Unless otherwise specified, references to dates and months refer to dates in 2014.

The victim and Jose shared custody of their two children.  The children would go to Jose on Sunday, spend Sunday and Monday night with him, and Jose would take them to school on Monday and Tuesday.  Tuesday night, the children would stay with the victim, and they would be with her until they went to school on Friday.  Friday nights and weekends would vary.

The victim's daughter was 11 or 12 in November.  She testified that, on Saturday, November 1, defendant stopped by the victim's apartment.  Defendant returned an apartment key to the victim.  Later, the children went to Jose's house and spent the night there.

On Sunday evening, November 2, the victim came to Jose's briefly.  She stated that she would return the next day to drop off the kids' P.E. clothes.  She left in her vehicle.  At some point later on Sunday night, Jose called the victim, but she did not answer or call him back.[4]

On Monday morning, November 3, the victim did not show up with the kids' P.E. clothes.  Jose called her, but she did not answer.  Jose took the children to school and then went to work.  He called the victim from work, but again she did not answer, call back, or text.  He picked up the kids after school and they all went back to his house.  That night, he continued to call the victim, but she did not answer, call back, or text.

The human resources manager at the victim's place of employment testified the victim generally worked Monday through Friday 7:00 to 4:30.  The victim had volunteered to work on Sunday, November 2, and extra hours on Monday, November 3.  However, she did not come to work on either day.  She also did not call in.  Previously, there had not been any occasions when the victim failed to report for work and did not call in.

---

[4]  At all relevant times, the victim was using her daughter's iPhone phone.

4

On Tuesday, November 4, the victim again did not appear at Jose's with the kids' P.E. clothes, and she did not call or text. Jose took the children to school and then went to work. He continued to try to contact the victim. After school, he picked the kids up and they all went back to his house. The victim was supposed to pick up the children that night, but she did not show up. Jose testified that the victim had never failed to pick up the kids.

On Wednesday morning, November 5, Jose took the kids to school and went to work. After school, he again picked up the children. Because he had not seen or heard from the victim since Sunday, Jose decided to go to the victim's apartment.

The victim's daughter was excited to see the victim, so she was the first person to get out of the car. She ran up the stairs with Jose behind her. She then put the key in the lock, turned the key, and opened the door.[5] When she opened the door, she saw the victim lying on the floor motionless. There was blood on the victim's clothes. Jose, arriving at the apartment door just after the victim's daughter, saw the victim on the floor. The victim was naked from the waist down. Her hair was matted with blood and there was blood "all over" her face. Jose told the victim's daughter to go downstairs with her brother. Based on her appearance, Jose concluded that the victim was dead.

**Text Messages[6] and Calls Between Defendant and the Victim on November 2**

As of 2014, defendant was dating and engaged to the victim. Defendant and the victim exchanged a series of acrimonious text messages throughout the day on Sunday November 2, beginning in the early morning hours as follows:

---

[5] The victim's daughter told Detective Lindsey Goesch that, when she turned the key, she heard a click so she knew the door had been locked.

[6] A printout of the text messages is included in the clerk's transcript. Where the text of the printout differs from the transcription in the reporter's transcript of testimony concerning the text messages, we have set forth the text messages as they appear in the printout.

At 3:41 a.m., defendant texted the victim, " 'But I guess you got rid of the kids for someone else to fuck you.' "[7]  At the same time, he texted her, " 'That's why I took your keys!' "

At 3:43 a.m., the victim texted defendant, "An abusive relationship."  At 3:44, the victim texted defendant, " 'U took my keys!  You are so wrong.' "

The victim placed two calls to defendant at 3:45 a.m.  At 3:47 a.m., the victim texted defendant, "Answer ur phone or I'll call pats[8] until she gets up."

At 3:46 a.m., the victim texted defendant, "I never cheated on you."

At 4:04 a.m., the victim texted defendant, "Bo don't trip I won't call the cops.  But thank u for opening my eyes."  At 4:05 a.m., defendant texted the victim, "Fuck your eyes."

At 4:06 a.m., the victim texted defendant, "Lol you had to steal the keys.  That's how low u got."

At 4:13 a.m., defendant texted the victim, "Enough . . . .  I'm done."  At the same time, the victim texted defendant, " 'Save your bull shit of an excuse.' "  Also at the same time, the victim texted, "I did not cheated [sic] on you."  At 4:14 a.m., the victim texted defendant, "So you tell yourself that to justify putting my kids roof and food in jeopardy."  At the same time, she texted defendant, "That's how much you care."  At 4:19 a.m., the victim texted defendant, "I least [sic] I know I don't have to worry about your mind games and abuse."  At 4:20 a.m., the victim texted defendant, "You proved you don't love me and u don't care about my kids well-being."

At 4:28, the victim texted defendant, "Thanks for the betrayal and making me feel unsafe."  At 4:29 a.m., the victim texted defendant, " 'Don't call me 'my love' hypocrite

---

[7]  As stated *ante*, on Saturday, the victim left the children with Jose for the night.

[8]  As we discuss *post*, Pat is one of defendant's sisters who was also friends with the victim.

6

is not another flaw u need to add." At 4:30 a.m., the victim texted defendant, "Yup I no longer feel safe or secure on my own place. And wonder what else am I missing for trusting u."

At 4:51 a.m., defendant texted the victim, "Thank you for saving me from giving you all the money I have, also from me having to go through all these phone numbers." At 4:54 a.m., the victim texted defendant, "I don't care about any numbers call them text them. Pay to know who they belong to . I DON'T CARE I NEVER DID YOU WRONG." At the same time, defendant texted the victim, "I'm falling asleep, bye." At 4:55 a.m., the victim texted, "so go back n flirt with marina or Christina or Dora." At the same time, defendant texted the victim, "LIAR!"

At 8:00 a.m., the victim texted defendant, "Why u hanged up." At 8:07 a.m., defendant responded, "Because you never tell the truth." At the same time, the victim texted defendant, "The [*sic*] called to confirm my appt and make sure my car had an actual key and not a push up start button."

At 8:09 a.m., the victim texted defendant, "Omg really? U already thinking bad?"

At 8:11 a.m., the victim texted defendant, "Okay, Moe I called u twice u decide to hang up n not answer."

At 8:15 a.m., defendant texted the victim, "I clearly heard what u said and it was not OMG." At 8:16, defendant texted the victim, "Tell him to give u a ride here to pick up ur key." At 8:17 a.m., the victim texted defendant, "U always clearly hear wrong I omg this early Good bye I'm blocking your number. Go back with her Moe be happy you love her not me. Clearly." At 8:21 a.m., the victim texted defendant, "Don't call, don't text. Go and fuck them we are done."

At 8:37 a.m., the victim texted defendant, "I just did cancel so please tell me where is the key." At 8:37 a.m., the victim texted defendant, "Don't make loose [*sic*] all trust please." At 9:13 a.m., the victim texted defendant, "Are you really coming?" At 10:51, the victim texted, "Can you please tell me where is my key."

7

At 10:53 a.m., the victim texted defendant, "And if someone is speaking on me bring them let's get this over with." At 10:54, the victim texted defendant, "Let whoever is fucking telling lies And fucking with your head playing games tell you in front of me."

At 10:57 a.m., the victim texted defendant, "Look Moses my job and my kids well being is not a game. So please, I'm asking you if u really cared about [my daughter] just a little can u tell me where is the key or come and give it to me." At 10:59 a.m., the victim texted defendant, "I should have never cancel that appt like an idiot I trusted you again." At 11:00 a.m., defendant texted the victim, "Who's Moses? . . . [D]on't getbme [*sic*] confused with one of ur other vatos." At 12:22 p.m., the victim texted defendant, "Where are you?"

At 4:16 p.m., the victim texted defendant, "Don't ever call." At 4:18, the victim texted defendant, "You had u r last change [*sic*] to prove u loved me n trust me n u just fucked any chance." At 5:00 p.m., the victim texted defendant, "Save it. U said I was being fucked u put no effort."

Defendant called the victim at 6:01, 6:02, and 6:03 p.m. At 6:06 p.m., defendant texted the victim, "Im at my moms. either come here or im going there." At 6:07 p.m., defendant texted the victim, "We need to talk." At the same time, defendant texted the victim, "My mom said why you not here." At 6:09 p.m., defendant texted the victim, "Im on my way." At 6:11 p.m., defendant texted the victim, "You want me to put effort, well Im about to." At 6:29 p.m., defendant texted the victim, " 'Where u at?' "

We discuss the timing and duration of phone calls that took place between defendant and the victim during the evening of November 2 in our discussion concerning defendant's evidentiary claims related to cell phone tower coverage, *post*.

**Defendant's Family and Defendant's Actions on November 2**

Defendant had an older brother, David, and a younger brother, Abraham. He had six sisters, including Pat, Maria, and Veronica. Maricela was their mother. Maria had a

8

son Johnny. Johnny sometimes stayed at Maricela's house, including around the time of the events discussed here. Pat was married to Pete.[9]

Pat and the victim were friends. Pat recalled seeing the victim in her car drop defendant off at Pat's house on November 2. Later, defendant borrowed Pat's car to go to Maricela's.

Johnny saw defendant outside of Maricela's house standing by Pat's car. Defendant was on the phone and sounded upset. Johnny heard defendant refer to the victim by name and say, " 'you want me to fucking -- you really want me to? You want me to? Okay. Watch. You want me to?' " Defendant called Johnny over to him. Defendant asked, "You fuck [the victim]?" and Johnny responded he had not.

At some point in the evening, Billy, a family friend, drove defendant to the victim's apartment in Pat's car.[10] Defendant told Billy he knew the victim was attractive, and he further stated that he better not catch Billy talking to her or making a pass at her. Later, Billy returned Pat's car to her house. Defendant was not with him.

At some point on the night of November 2, Pat received a call from defendant who was with the victim at her apartment. Pat could hear the victim in the background. Defendant asked Pat to have someone pick him up.

Pat went into the garage where Pete was with a friend, Levy, and Pat asked Pete to go pick defendant up. Levy and Pete left in Levy's truck.

### Events After Defendant Left the Victim's Apartment on the Night of November 2

Levy and Pete parked in the victim's apartment complex parking lot. Pete texted defendant to let him know he had arrived. Shortly after Levy and Pete arrived, defendant

---

[9] Pat and Johnny testified under a grant of use immunity.

[10] Billy testified under a grant of use immunity.

came out to the truck from the victim's apartment and got in the truck. They then drove back to Pat and Pete's house.

David testified that, on Sunday night, November 2, he received a call from defendant, who told him to go to Pat's house.[11] David did not go right away. Pat then called and she told David to come over. David drove to Pat's house and went inside. Pat was pale. David asked what was going on and Pat just pointed to the garage.

David went into the garage where he saw Pete smoking methamphetamine. David asked what was going on, and Pete responded, " 'Little Bro fucked up.' " David knew Pete was referring to defendant. Defendant entered the garage. David asked defendant what was going on, and defendant responded " 'I smacked my bitch,' " and held up his right hand with his thumb up and his fingers pointing in the shape of a gun. David testified that the term "smack" is used by Norteños to mean "kill someone" and defendant was a Norteño. Defendant left the garage and went back into the house. David asked Pete, " 'What bitch is he talking about?' " and Pete responded with the victim's nickname.

As David was leaving Pat's house, defendant asked for a ride, so David gave defendant a ride to Maricela's house. Defendant asked David for his extra cell phone, a blue flip phone and then asked about a phone number that was on the phone. He asked David if David had been calling the victim. David reminded defendant that defendant had the phone earlier in the day.

Detective Kevin Papineau of the Elk Grove Police Department testified that he reviewed call records from cell phones associated with Pat, Pete, David, the victim,

---

[11] David acknowledged that, at the time of trial, he was in custody on an unrelated state case. He had several prior convictions and he acknowledged that he used methamphetamine and heroin for approximately 15 years. The prosecutor's office made him a plea offer we discuss *post*.

defendant, the blue flip phone, and Levy for the period between November 2 through November 5.  Papineau testified that, in the late night of Sunday, November 2, into the early morning of Monday, November 3, there was "a very increased volume of calls and activity between the various numbers that are associated with the people involved in the investigation."  This included Pat, David, Pete, Levy, Veronica and the blue flip phone used by defendant.[12]

However, at no time after 9:48 p.m. on November 2 did the blue flip phone defendant had been using call or text the victim's phone.

Pat testified that she did not recall numerous outgoing and incoming calls on her phone that night.  Normally, on Sunday night going into Monday morning, she would be asleep.  She testified that it would not be typical for her to make many phone calls on a Sunday night going into Monday morning.

---

[12] On November 2, at 11:21 p.m., Pat called David.  At 11:49 and 11:58 p.m., Pat called Pete.  At 11:58 p.m., Pat called David.  On Monday, November 3, at 12:03 a.m., Pat called Veronica.  At 12:26 a.m., Pat called Pete.  At 12:37 and 12:55 a.m., Pat called David.  At 1:00 a.m., Pat called Pete.  At 1:03 a.m., Pete received a call from an unidentified number.  At 1:19 a.m., the blue flip phone called Pat.  At 1:21 a.m., Pat called the blue flip phone.  At 1:22 a.m., the blue flip phone called Levy.  At 1:28 a.m., Levy called Pete.  At 1:29 a.m., Levy called Pat.  At 1:34 a.m., Pat called Levy.  At 1:36 and 1:39 a.m., Pat called Pete.  At 1:44 a.m., Pat called Levy.  At 1:46 a.m., the blue flip phone called Pat.  At 1:47 a.m., Pat called an unidentified number.  At 1:50 a.m., Pete called Pat.  At 2:00 a.m., Pat called an unidentified number.  At 2:02 a.m., Pat called another unidentified number.  At 2:08 a.m., the blue flip phone called Pat.  At 2:30 a.m., Pat called the blue flip phone.  At 2:31, Levy called Pete.  At 2:33 a.m., Pete called an unidentified number (that Pat had called earlier).  At 2:36 a.m., Levy called the blue flip phone.  At 2:48 a.m., the blue flip phone called Levy.  At 3:08 a.m., David called Pat.  At 3:47 a.m., the blue flip phone called Pat.  At 3:54 a.m., David called Pat.  At 4:10 a.m., David called Pete.  At 4:16 a.m., the blue flip phone called Levy.  At 4:37 a.m., Veronica called Pat.  At 4:53 a.m., Levy called the blue flip phone.  At 4:55 a.m., Levy called Pete.  At 5:01 a.m., Pete called Levy.  At 5:04 a.m., Levy called Pete.  At 5:06 a.m., Pete called David.  At 5:11 and 5:14 a.m., Pat called David.  At 5:37 a.m., Levy called Pete.

David testified that, at about 4:00 in the morning, at Maricela's, he found defendant pacing. David heard defendant say that he "wanted to go lay down with" the victim.

Johnny testified that, at some point, Maricela knocked on his door. She told him that "she thinks [defendant] hurt [the victim] and the cops might be coming." Johnny went to talk to David and asked him if it was " 'true what happened with [defendant] and [the victim].' " David replied, " 'I think [defendant] killed [the victim].' " Later, David took defendant to Abraham's house. Defendant stayed at Abraham's house and David went back to Maricela's.

On Monday morning, Pat and Pete went to Abraham's house. Johnny went there as well. At Abraham's house, Johnny heard a conversation between defendant and Pete. Defendant stated he had the victim get undressed and when she pulled down her underwear, "there was, like, stuff on it like she had just cheated. So he said that when he seen that, he said he couldn't take it. He shot her in the head, boom. And then he got out of there." Defendant also talked about throwing a gun away. Johnny further testified defendant said: "She fucked somebody else, and she was late to meet him, and then when she pulled down her panties, she was all wet, and it was hella -- and he said he felt at that moment it was the perfect time to shoot her." Johnny continued, "When he came back, I guess [the victim] was alive still. She walked to the front door. She put her underwear in the garbage, and she was still alive, and then he said he finished her off." Johnny testified defendant stated that, after he found something in the victim's underwear, she tried to grab the phone and make a call. Defendant shot her in the head. Defendant said when he returned to the victim's apartment, she had made it from the back room to the front room. She was still alive. So he finished her off. Johnny testified that he had previously seen defendant carry around a .40-caliber handgun.

On cross-examination, Johnny testified that, at Abraham's house, defendant came up to Johnny and told him he killed the victim. He also testified to a version of the event

12

where he was sitting in a car during this conversation. Johnny testified he thought Pete heard the exchange.

Billy testified that, at some point on Monday, November 3, Maricela told him that she thought defendant was in big trouble because he may have shot someone. A couple of days later, Maricela asked Billy to drive defendant to Mexico.

**Cell Phone Call Frequency Analysis**

Daniel Garbutt, an investigator in the prosecutor's office, testified that he prepared call frequency reports. In the period between September 11 through November 1, there were 58 text messages and 92 voice calls exchanged between Pat's phone and the victim's Samsung phone. In the period between October 28, and November 2, there were five text messages and 14 voice calls between Pat's phone and the victim's daughter's iPhone which the victim was then using. After November 2, at 9:33 p.m., there were no text messages or voice calls exchanged between Pat's phone and the iPhone the victim was using.

Between September 11 and October 29, there were 3,023 text messages and 590 voice calls exchanged between defendant's phone and the victim's Samsung. Between October 8 and November 2, there were 217 text messages and 108 voice calls between defendant's phone and the iPhone the victim was using. After 9:01 p.m. on November 2, there were no text messages or voice calls exchanged between defendant's phone and the victim's iPhone.

Garbutt testified that the cell phone account associated with defendant was terminated on November 3. The last call to or from defendant's phone was an incoming call at 10:43 p.m. on November 2.

**Defendant's Flight**

Ruben, defendant's cousin, testified that he drove defendant to Mexico on Tuesday, November 4.[13] The prosecutor showed Ruben a photograph taken at the U.S. border, and Ruben testified that the photograph showed him and defendant in a car together. The parties stipulated that, if called to testify, United States Immigration and Customs Enforcement Officer Agent Mark Valledor would testify that, on November 5, at 4:12 a.m., Ruben crossed into the United States from Mexico at the San Ysidro border crossing, and, at the time, an adult male was seated in the passenger seat. Papineau testified the photograph depicted defendant and Ruben crossing the border from Mexico into the United States on the morning of November 5.

Four months passed between the victim's death and when defendant was ultimately located by law enforcement in Mexico.

**The Crime Scene**

Detective Papineau testified that there was no indication of forced entry at the victim's apartment. The victim's body was in a hallway leading from the front of the apartment to the back. She was naked from the waist down. Papineau observed two ligatures around her neck. One was a cloth, and the other was a black cord, perhaps from a laptop.[14] Near her was a tipped over vacuum cleaner. The majority of blood at the crime scene was on the bed, mattress, and pillows. There was a bullet hole in a pillow adjacent to a pool of blood on the bed. A clump of hair appeared to be laying on top of the pillow. "[I]t appeared the projectile had gone through the entire pillow and left the hair pulled into the hole."

---

[13] Ruben also testified under a grant of use immunity.

[14] No corresponding laptop was found in the apartment.

14

In addition to the bed, there was blood on the floor in front of the bed toward the door, and trailing down the hall. The "blood on the floor was, like, trail blood." Blood smears were found on the wall in the hallway, on the tipped-over vacuum cleaner, on the baseboard, and on a door and door frame leading from the master bedroom into the hallway. The blood smears on the wall were two feet high or lower.

Next to the victim's right arm, in the entryway to the bathroom, was a pair of yoga pants and a pair of underwear. The underwear was entangled with the yoga pants, consistent with the two items having been taken off together.

There were no obvious signs of theft. There were items on an entertainment center, a video game console, and an Apple iMac computer. A Samsung mobile phone was on the master bedroom windowsill. An iPhone 4 was on the floor in the master bedroom closet.[15]

In 2011, Jose had bought the victim a Taurus .38-caliber handgun that was registered in the victim's name. The gun was not found in the apartment. As discussed in a stipulation, *post*, the handgun, with a partially destroyed serial number, was later located by the Nevada County Sheriff's Office in Grass Valley.

A knife found on the carpet close to the victim's body was processed, but no usable prints were discovered on it. A latent fingerprint lifted from an exterior bathroom door handle matched defendant's right index finger.

**Forensic Pathology**

Dr. Jason Tovar, a pathologist, visited the scene on the day the victim's body was found and later performed the autopsy on her. The victim had a gunshot wound which clipped her left ear and entered behind that ear, travelling from front to back. The bullet entered into the victim's brain, extensively damaging the occipital region and the

---

[15] The Samsung was the victim's phone, which had stopped working. The iPhone was the victim's daughter's phone which the victim had been using.

15

cerebellum, which is involved in coordination, movement, and balance. Such an injury could impair the victim's ability to walk, to engage in fine motor skills, and possibly to see. The wound was potentially survivable, but left untreated could result in death. Tovar also found a gunshot wound and stippling to the palm of the victim's right hand.

Tovar testified that three different ligatures were around the victim's neck, a cord from an electronic device, a strap, and a T-shirt.

Tovar testified that the cause of death was a gunshot wound and strangulation. He was unable to determine a particular time or date of death. He could not say whether the victim was killed on November 2, 3, 4, or 5. To fix the day she was shot or strangled would be speculation. He did, however, determine that "there was evidence of inflammation, that suggests an interval of time after the gunshot occurred that she was alive. So she was breathing." Also, there was internal hemorrhaging in the neck, indicating that the victim's heart was pumping when she was strangled.

Pertinent to witness statements we discuss *post*, Tovar testified he did not note any fractures in the victim's neck. He found no indication that anyone had stomped on her neck or "stepp[ed] on her neck and put[] their weight down to crush her neck."

**Apartment Complex Residents**

A.S. lived in an apartment on the second floor of a building at the apartment complex. Her daughter, S.B., was five years old in November. A.S. testified that the victim's apartment was on the second floor, to the left of A.S.'s apartment building. The bedroom A.S. shared with S.B. had a window facing a quad area outside. The bedroom A.S.'s mother, J.S., occupied had a window that looked out towards the victim's apartment.

A.S. told police that, either on the Monday or Tuesday before the victim's body was found, she heard noises. She was in her bedroom at the time, lying down with S.B. This was between 7:00 and 8:00 a.m. Two days after the victim's body was found, she told officers that she heard the sounds between 8:30 and 9:00 a.m. A.S. described the

16

noises as "someone almost -- someone or something that sounded like they were whining . . . or in pain." It sounded like a female. The noises lasted for two to five minutes. The sound seemed to be coming from the quad area. A.S. looked out her window, but she did not see anything that was causing the sound.

A.S. testified that she never heard a gunshot. However, S.B. told her months later that she heard a gunshot. S.B. told A.S. about having heard a gunshot for the first time after S.B. spoke with a defense investigator.

**Defendant's Family Members' Statements to Police**

Pete was interviewed by Papineau and Detective Bearor. Clips of Pete's November 10 interview were played for the jury during Papineau's testimony.

In the interview, Pete told detectives that, on Sunday, November 2, when he was leaving with his sons to go to the store, he saw defendant and the victim pull up to Pete's house. When Pete returned, Pat's car was gone. Defendant had borrowed it. Billy brought it back. Later, Pat told Pete that defendant needed a ride, so Pete and Levy went to pick up defendant.

After they picked defendant up, defendant told Pete: " 'Bro, I called her and she was making sound [*sic*] like she was getting fucked.' " Defendant "said that he had followed her into her apartment so she didn't have no time to take a shower or nothing like that. And he said that . . . she didn't have no time to take a shower and he hadn't been with her for a while, . . . he told me that there was stains on her underwear from someone that she was with." Defendant thought Pete had been with the victim, but Pete said, " 'No, bro, no.' " Defendant pressed Pete, saying, " 'Look bro, just tell me the truth. Were you with her?' " Pete responded he was not.

At some point in the interview after Pete learned it was the victim's young daughter who found the victim's body, Pete told detectives, "I'm gonna tell you guys this shit because honestly God would curse me if I didn't. Okay? But I mean, she was pushin' his buttons. Okay?" Pete continued: "She was pushin' his buttons. He couldn't

17

take that shit and she thought he was playin' around, so he popped her.  I'm thinkin' he's jokin'.  I'm thinkin' he's playin' around.  I'm thinkin' he's kiddn'.  Okay?"  According to Papineau, when Pete said defendant popped the victim, Pete made a hand gesture simulating a gun, with two fingers and his thumb up.  Pete then stated:  "see it on the news and I'm, like, 'Oh, fuck.  He wasn't playin'.  He fuckin' really did.' "  Pete told the detectives Levy dropped them off and someone else picked defendant up.

Pete said that the next day, many of the family members went to Abraham's house.  At one point, Detective Bearor asked Pete if he heard something more, and Pete responded, "That he tried to ride back over there?"  Pete also said that, at Abraham's, "[i]t was that same conversation again."

Pete told the detectives that Pat was "freakin' out.  She was just, like, 'Oh my God.  Oh my God.'  I was, like, 'Calm down.  Calm down.'  You know what I mean?  And - and - and I was, like, 'No, no.'  'Cause this is before the news incident and I was, like, 'Calm down.  No.  We don't know.  Calm down.'  You know?  'We're not sure.  You don't know.  Just calm down.'  Said, 'You're blowin' it to somethin' - into somethin' it's not.' "

As the interview went on, Pete stated, "I hope this don't cost me my life," "[b]ecause I got a wife and I got kids and I love them very much."  He said, "this right here - yeah, might just cost me my life."  He said, "Tell you right now you guys go and say that I gave up information it's gonna fuck me."  Pete told the detectives that he was "goin' back and I'm sayin' I didn't tell you guys a fuckin' thing."  He repeated his fear that his talking could cost him his life.  In the last statement on the last clip of his interview, Pete stated:  "Fuck it.  I'm dead anyway so I got no way . . . to provide for my kids."

At trial, Pete testified that, at the interview, Papineau put pressure on him and told him that someone had accused Pete of murdering the victim.[16] Pete testified that he got pressured into saying things that were not true. He also testified that he did not recall making specific statements he made in the interview.

Johnny was also interviewed by the detectives. Papineau testified that, in his interview on November 10, Johnny said defendant had told him that he had the victim take off her pants and underwear and he saw stains. Papineau noted that both Johnny and Pete told him defendant told them he had found stains in the underwear when they were separately interviewed, and he had not told either of them what the other had said on this subject. Johnny and Pete also both independently told Papineau that defendant had returned to the victim's apartment. Johnny also told Papineau defendant had said he wanted to lay down with the victim again. Additionally, they both independently told Papineau about an argument defendant had on the phone with the victim. Pete and Johnny both told Papineau that defendant had accused each of them of having an affair with the victim. They both also told Papineau defendant acted jealously towards the victim. And both Johnny and Pete separately told Papineau that defendant confessed to killing or shooting the victim.

At some point, Maricela found out Johnny had spoken with police. Maricela told him defendant claimed Johnny "snitched on him." Pete testified that at some point someone gave him a copy of Johnny's statement, though he could not recall who. After these events, Maricela would not let Johnny stay at her house. None of his family wanted him around.

---

[16] Papineau acknowledged he lied to Pete by telling him that defendant had accused him of killing the victim.

Maricela testified that Pat and Pete showed her a copy of the statement Pete made to the police. She did not know how they got a copy of the statement. Pat told Maricela that Pete lied in his statement. Maricela testified that Pat was mad.

Around New Year's, 2015, David went to Mexicali and saw defendant. When David returned to the United States, he was arrested by the FBI for possession of drugs for sale. He was in possession of methamphetamine and heroin. David met with a federal prosecutor as well as the prosecutor in this case. The federal prosecutor told David that if he cooperated and told the truth about defendant, he could get up to a 60 percent reduction in his federal sentencing. David decided he would tell what he knew. David acknowledged that, through his cooperation agreement, he was facing a minimum term, between his federal and state prosecutions, of four years or less as opposed to the "functional equivalent of life in prison" he faced absent the deal.

Elk Grove Police Department detective Mitchel Marquez interviewed Billy, who told him that, about a month before the victim's death, defendant had threatened to kill her. Billy did not take the threats seriously.

**Johnny's Background**

Johnny acknowledged he was "a snitch." Age 32 at the time of his testimony, he had been working as an informant providing police with information since he was 18 years old. Johnny had a handler with the police whom he referred to as Sergeant Dan.

Johnny testified that being a snitch put his life in danger. He had children and he worried about their safety when they were with him because "people say stuff about [him], and people try to shoot at [him] -- they shot at [him] before -- and fight [him] and stuff . . . ."

Papineau testified that a phone associated with Johnny placed calls to a Sergeant Dan Farnsworth on Tuesday, November 4, at 2:08, 2:39, 6:35, and 9:08 p.m. Farnsworth testified that Johnny called him several times that day. He told Farnsworth that "something may have happened between" defendant and the victim. Johnny testified he

20

called Farnsworth over successive days and told him repeatedly that defendant killed the victim.

**Johnny's Confessions**

Johnny told Maricela and a friend, Christina, that he killed the victim and explained to the jury why he told them that. Johnny testified that, as recently as November 2017, he was in jail at Rio Cosumnes Correctional Center on an unrelated matter. While he was there, he was subpoenaed in this case.

When Johnny got out of jail, he went to a female friend's house and showed her the subpoena. Later that same day, someone named Monster beat him up. Monster chased him, made comments about Johnny being a snitch, and told him not to go back to his family's house. Johnny was worried about being killed.

Later, Johnny called a female friend. He told her that he was the one who actually killed the victim. Asked why he did so, Johnny testified: "Because that was the only way I could get back in good with her so she wouldn't think I'm going to try to snitch on her." He testified, "I said I was taking the blame for it. Basically, I had to say that . . . I killed her." Johnny testified that he did not kill the victim.

Johnny acknowledged that he asked Christina to come to court and testify that he killed the victim. He did so because he wanted there to be more people to corroborate his story that he killed the victim and thus was not a snitch. Johnny testified: "I'd rather be getting caught for something that I am not doing, like for a murder that I have not did. I would rather be caught for that than known as a snitch before, when my kids were here in Sacramento. Now that they're gone, the truth can be told, and now I feel different about everything."

On cross-examination, Johnny testified that he told Christina he went to the victim's apartment at a time he knew defendant was out of town to confront her about taking his wife to the Bay Area to prostitute her. Johnny told Christina, "if you love me, you'll tell someone." Johnny told Christina that he could not have defendant "go down

21

for this when he didn't do it."  He explained to the jury:  "I had to make her really believe that I did it so that if other people asked, she could explain to them that I really did it, so that I won't get beat up or shot at, like I have been."  Johnny testified that, in fact, the victim never took his wife to the Bay Area.

Christina testified that Johnny told her:  " 'If you love me, you'll testify for me.' "  Johnny told her that he killed someone.  "He told me that he had went to that person's house and gone in and yelled at her and made her put a pillow over her face in the back of her head, and he shot her in the front of her face -- or the pillow, and her brains and her skull blew back in the back of the pillow, and she fell, and she was screaming, and he stood on her throat to finish it off, because she wasn't dying."  Christina specified that Johnny told her he made the victim hold the pillow in front of her face, and that she remained standing for a few seconds after Johnny shot her.  Thus, Christina understood from Johnny's description that the victim was standing when he shot her.  Johnny did not say anything to Christina about wrapping any ligature around the victim's neck.  Johnny also told Christina that he threw the victim's underwear in a trash can.  Johnny told her the reason he confronted the victim was because she had introduced Johnny's wife to prostitution.

Johnny also acknowledged on cross-examination that he told Maricela he killed the victim.  Johnny, who was raised by Maricela, told her that he framed defendant because he was jealous of the way Maricela treated defendant.

Maricela remembered that Johnny told her several times that he killed the victim.  Johnny told her he killed the victim because he was jealous of defendant and that Maricela loved defendant more.  She also remembered that Johnny said the victim "took his wife, and she was selling her."

Defense counsel asked Johnny if he killed the victim.  He responded that he had nothing against her.  On redirect, Johnny testified, "No, I did not kill" the victim.  Asked

why he confessed to a murder he did not commit, Johnny replied he had "people who were trying to kill me. I had no choice."

At one point during his cross-examination, Johnny acknowledged: "Everything that I do, I lie, and I lie a lot." The prosecution recalled Detective Papineau to testify after Johnny's testimony. The prosecutor asked if, in his two interviews with Johnny, they "just take his words as the truth." Papineau responded that he did not because Johnny "is a hot mess." Papineau testified that he would look for corroboration to prove or disprove what someone like Johnny told him.

**Defense Evidence**

### The Victim's Workplace

A coworker of the victim testified that, in October 2014, he observed the victim cleaning out her desk. Sergeant Joshua Magdaleno testified he interviewed the coworker. According to the coworker, when he saw the victim cleaning out her desk, she told him she was going to do something to get fired. On cross-examination, Magdaleno acknowledged the coworker did not say when in October 2014 this occurred, and that it could have been at any time during that month.

### Apartment Complex Residents

J.S., A.S.'s mother who lived with A.S. in the apartment complex, testified she heard a strange moaning on the Tuesday before the victim's body was discovered. The sound was like a female in distress. J.S. believed the sound was coming from the direction of the victim's apartment. J.S. did not hear a gunshot.

On November 5, after the victim was discovered, Officer Vladimir Parra interviewed A.S. and J.S., and they both told him they heard the moaning on Tuesday at about 8:30 a.m. On November 7, Magdaleno also interviewed J.S., and she told him she knew she heard the moaning on Tuesday, not Monday, because her son had come to bring her car to her, something he did not do on Monday. S.B., A.S.'s daughter,

23

remembered the morning when she and her family heard moaning noises. She also heard one or two gunshots.

S.W-J. also resided at the apartment complex. She testified that she saw the victim on Monday, November 3, around 8:00 a.m. She told a police officer who interviewed her about seeing the victim at that time. But on cross-examination, S.W-J. acknowledged that she did not see the victim's face; she only saw her back.

K.J., S.W.-J.'s daughter, testified she used to play with the victim's daughter. K.J. remembered seeing the victim "the beginning of the week, because I remember everybody was going to pay their rent, and I was -- I remember in the morning, and she was walking either towards the office -- our apartment office, and said 'hi' and she said 'hi,' and I continued walking home." K.J. testified it could not have been Sunday when she saw the victim, but it could have been Monday, Tuesday, or Wednesday.

### DNA Evidence

Joy Viray testified as an expert in DNA analysis. Viray analyzed an electrical cord, a knife, the "autopsy kit" from the coroner, and a .38-caliber Taurus revolver. On the Taurus revolver, Viray found a mixture of DNA. The major contributor's profile did not match defendant's DNA profile. Viray testified she did not analyze the cord that was found wrapped around the victim's neck. There was so much blood on it that a search for other contact DNA would have been difficult. Viray testified that none of the DNA analysis she performed in this case identified defendant as the victim's killer.

### Ballistics

Bruce Moran, a retired criminalist, examined the .38-caliber Taurus revolver. He also examined the base portion of a nominal .40- or .41-caliber copper jacketed bullet which was recovered from the victim's head. Moran testified the bullet recovered from the victim was not a .38-caliber projectile and could not have been fired from the Taurus revolver. On cross-examination, Moran testified that the bullet could have been fired from a .40-caliber handgun.

24

**Stipulations**

The parties stipulated, in pertinent part, to the following:

"If called to testify, Deputy United States Marshall Antonio Adame located and arrested [defendant] on March 5th, 2015, in San Luis, Mexico. Upon contact, [defendant] was in possession of a California Identification Card for Abraham Valdez.

". . . If called to testify, Deputy Brandon Lampe would testify as follows: On April 15th, 2015, at 9:59 a.m., I was dispatched to a residence on Evergreen Road in Grass Valley for a reported handgun that was found. . . .

 . . .

"After making the weapon safe, I located two different areas on the handgun where the serial number appears to have been altered. Using a combination of the two serial numbers, Nevada County Sheriff's Office dispatch conducted a records check of the weapon and advised the weapon was a reported stolen handgun associated with an Elk Grove Police Department investigation. Dispatch personnel contacted Elk Grove Police Department.

[¶] . . . [¶]

" . . . When David . . . provided his statement to authorities on April 8th, 2015, he had not seen any police reports or videos related to this case.

"On November 2nd, 2014, [the victim] . . . called locksmith . . . and cancelled a request to have a key made for her [car]."

**Verdict and Sentencing**

The jury found defendant guilty of murder in the first degree, and found true the allegation that, in the commission of the murder, defendant personally and intentionally discharged a firearm causing the victim's death. (Pen. Code, §§ 187, 12022.53, subd. (d).)

At sentencing, defendant moved to strike his prior convictions or, in the alternative, to strike one prior and the Penal Code section 12022.53, subdivision (d),

25

enhancement.  The court denied defendant's motion.  The trial court found true the allegations that defendant had sustained two prior strike convictions.  The trial court sentenced defendant to 100 years to life calculated as follows:  75 years to life on count one, plus an additional 25 years to life on the Penal Code section 12022.53, subdivision (d), enhancement.

**DISCUSSION**

**I.  Admission of Cellular Tower Coverage Evidence and Phone Locations**

**A.  Additional Background**

**1.  Expert Qualification Testimony & Defendant's First Objection**

No in limine motions were made as to the cellular phone evidence at issue.[17] Instead, defendant made two oral objections during trial — the first after prosecutor tendered the expert's qualifications and, as we discuss *post*, the second during the expert's trial testimony.

District Attorney Investigator Daniel Garbutt testified he had been a sworn peace officer for more than 22 years.  He had been working with cell phones and cell phone records for 12 or 13 years.  He had taken a 40-hour course with ZetX, a company that employs a computer program to map cellular phone calls.  According to Garbutt, ZetX "[e]ssentially . . . takes phone records that are obtained from a phone company . . . .  It imports them into a computer program, and then it puts them into a usable format in Google Earth Pro so that you can simply click on a particular call in a records set and see exactly, on a particular phone, whether it was an incoming or outgoing call, text message. [¶]  . . . And then it will give the physical location of the cell tower in a particular area; also a corresponding approximate coverage area of what area on a map that that cell

---

[17] The only motion in limine pertaining to cell phones was defendant's motion to preclude text messages on the grounds that they were hearsay, lacked foundation, or were inflammatory.

26

tower will cover, and, thus, allow a phone or device to make and receive calls." Garbutt testified that the locations of cell towers are automatically mapped in the program based on information provided by the cell phone companies. He did not indicate the specific information provided by those companies.

Garbutt continued: "We know, based on what the data that the telecommunication companies give us, that these mapping locations of towers are both accurate, as well as the coverage areas, and which way that these particular towers are facing." Garbutt had testified as an expert regarding cell tower mapping and data at least five times.

During defense counsel's voir dire on Garbutt's qualifications, he testified that he would be testifying about "what tower [a] phone used for a particular date and time to make and receive a phone call." When asked whether he was qualified to approximate coverage areas, Garbutt responded: "I am not qualified to approximate it. I don't approximate it. Those approximations are provided based on cell tower -- the particular cell tower that's provided from the telecommunications company to ZetX, and ZetX approximates it." Garbutt testified that ZetX has an algorithm it uses to approximate the cell tower coverage area. When counsel asked whether Garbutt would be relying on the coverage area approximations provided by ZetX in providing testimony about those coverage areas, the court interrupted and told counsel the questions he was posing did not go to Garbutt's qualifications and asked whether he had anything to ask about the witness's qualifications. Counsel responded: "I am prepared to object to his testimony," and said nothing more. No grounds for the objection were stated. The trial court then stated it was recognizing Garbutt as an expert in cell phone communications and cell phone records. Thereafter, Garbutt provided the following testimony.

## 2. Garbutt's Testimony

The video mapping program provided by ZetX is called TraX. Nobody from ZetX testified. Only Garbutt testified about the program and its use.

27

Garbutt uploaded the "raw data" provided by the cell phone providers for cell phone numbers relevant in this case to ZetX, which then produced a file using Google Earth Pro.[18] ZetX requires the original file provided by the cellular provider, and will not accept files that have been altered in any way. He described how the TraX program is used once the cellular provider data has been uploaded. "You simply click on a particular call that has the corresponding date and time. It will take you to that call on a map with the city streets located in Google Earth Pro. [¶] It will show you the exact correct location of the cell tower itself and an approximation of the approximate coverage area." Garbutt clarified: "Could this phone be making or receiving a call a little bit out of this particular coverage area? Absolutely. A lot out of it? No. The best way I can describe this approximate coverage area is, it's a very strong estimation."

Referencing the color-coded shaded areas on the map representing the coverage areas, defense counsel asked on cross-examination: "And that's not your opinion of the range. That's an algorithm within the ZetX software?" To that, Garbutt responded: "That they developed within their software based on the information they're getting from the telecommunication provider." Asked whether he was relying on the algorithm for the maps, Garbutt responded: "As to a general location of the cell phone, yes. As to an exact location? No." He acknowledged that a phone could be anywhere within the coverage areas designated on the map, and that the program was much less accurate than GPS. He also acknowledged that phones do not always connect to the closest tower and ZetX does not indicate whether there was a closer tower to any particular phone when it connected to a tower; it only indicates the tower the phone connected to.

---

[18] Garbutt testified that, with the exception of AT&T, the raw data produced by the cellular providers is in the form of an Excel spreadsheet. He did not testify as to how AT&T presented its raw data.

28

Garbutt described relevant cell phone activity which was mapped on the TraX program. During his testimony describing the calls and the towers to which the phones connected and the coverage areas where the calls were placed and/or received, the prosecution played videos created by the TraX program, mapping the calls on Google Earth Pro. Some of this call activity is described below.

On November 2, at 5:10 p.m., from a coverage area where Pat's house was located, defendant called the phone the victim was using (hereafter the victim's phone) and the call lasted more than five minutes. At this time, the victim's phone was located in a coverage area that included the location of Jose's house.

At 5:50 p.m., defendant's phone placed a call to the victim's phone from a coverage area that included the location of Maricela's house. At the time, the victim's phone was still in the coverage area including the location of Jose's house.

At 6:01 p.m., defendant's phone placed another call to the victim's phone that lasted 25 seconds. The victim's phone was still located in a coverage area that included the location of Jose's house.

At 6:02 p.m., defendant's phone placed a call to the victim's phone which lasted 24 seconds. The call was placed from a coverage area that included the location of Maricela's house.

Another call from defendant's phone to the victim's phone occurred at 6:03 for 35 seconds. This call started on one cell tower and ended on another, both including coverage areas that included the location of Maricela's house.

There was an 11-second call from defendant's cell phone to the victim's phone from the coverage area including the location of Maricela's house, and then, at 6:18, another call from defendant's cell phone to the victim's.

At 6:21 p.m., defendant's phone received a call from the victim's phone. The call came from a coverage area in an area of South Sacramento and Highway 99.

29

At 6:22 p.m., a call was placed from defendant's phone to the victim's, still in a coverage area including Maricela's house.

At 6:24 p.m., a call was placed from defendant's phone to the victim's phone which lasted more than 13 minutes. The coverage area where the victim's phone received this call was consistent with her nearing the location of her apartment.

At 6:39 p.m., defendant's phone placed a call to Pete's phone that lasted 52 seconds. The call ended on a tower to the south of the tower where the call began. However, Garbutt could not say "for sure" that defendant's phone traveled south during the course of this particular call, although it was possible. Pete's phone was in a coverage area that included the location of his home when he received this call.

At 6:42 p.m., defendant's phone placed a call to Pat's phone that lasted 27 seconds. When this call was placed, defendant's phone connected with a cell phone tower farther south still than his previous calls.

At 6:43 p.m., defendant's phone placed a call to the victim's phone. This call lasted nine minutes 45 seconds. The call started on one cell tower and ended on another. During the call, defendant's phone was moving west, towards the location of the victim's apartment. The call started near a tower in the vicinity of Highway 99, but ended on a tower near the victim's apartment. By the time of this call, the victim's phone was at or near her apartment according to Garbutt.

At 7:32 p.m., defendant's phone made a call to Pat's phone that lasted two or three minutes. At this time, defendant's phone was in a coverage area that included the location of the victim's apartment.

At 8:22 p.m., defendant's phone, in a coverage area including the location of the victim's apartment, placed another call to Pat's phone, this one lasting just under three minutes.

At 8:28 p.m., the victim's phone, connecting to a tower in the general area of her apartment, received a call from defendant's phone.

30

At 9:00 p.m., defendant's phone placed a seven-second call to the victim's phone. Both phones connected to the same tower in the general area of the victim's apartment.

At 9:10 p.m., defendant's phone made a call to Pat's phone that lasted 51 seconds. Defendant's phone was still in the general area of a tower near the victim's apartment.

At 9:31 p.m., the victim's phone placed a call to Pat's phone, connecting to a tower close to the victim's residence.

At 9:39 p.m., Pete's phone made a call to defendant's phone from a coverage area including the location of Pete's house. Defendant's phone was in the general area of the victim's apartment.

At 9:42 and 9:43 p.m., defendant's phone received calls from Pat's phone. Defendant's phone was still in the general area of the victim's apartment.

At 9:48 p.m., the victim's phone placed a call to an unidentified number. At the time, the victim's phone was in the general area of her apartment. This is the last outgoing activity from the victim's phone.

At 10:03 p.m., Pete's phone placed a call to Pat's phone.

At 10:06 p.m., defendant's phone received a call from Pat's phone. Defendant's phone was still in the area covered by a cell tower near the victim's apartment.

At 10:07 p.m., Pete's phone received a call from defendant's phone. By this time, Pete's phone was in the area of the victim's apartment. Two minutes later, at 10:09 p.m., defendant's phone received a call from Pete's phone. Both were in the general area of the victim's apartment. At 10:12 and 10:17 p.m., defendant's phone made a call to Pete's phone. Both phones were both still in the general area of the victim's apartment.

At 10:41 p.m., defendant's phone placed a call to an unidentified number. By this time, defendant's phone was located in a coverage area that includes the location of Pete and Pat's house.

Garbutt also testified about a number of calls placed by Jose's cell phone to the victim's cell phone. These were made between November 2 at 9:48 p.m. and November

31

5. When the calls were placed, Jose was at locations in coverage areas including the location of his residence and other areas unrelated to the case. The victim's phone was general area of her apartment. All of the calls received on the victim's phone lasted no more than 25 to 40 seconds. Garbutt testified that a typical call routed to voice mail could last 20 to 40 seconds, depending on a number of factors.

Between 9:48 p.m. on November 2 and 5:03 p.m. on November 5, the victim's phone never made any outgoing calls and never moved from the area of her apartment.

Between November 2 and November 5, Jose's phone was not in the area of the victim's home except at 5:03 p.m. on November 5, when Jose's phone called the victim's phone.[19]

### B. *Kelly*, Sections 801/802, and Ineffective Assistance of Counsel

### 1. Defendant's Contentions

We first note what defendant is not contesting. Defendant is not challenging the records of text messages, phone calls, the dates and times of texts, or the dates, time and duration of phone calls between the various phones associated with defendant, the victim and witnesses. His challenge relates only to the video mapping evidence concerning the location of the cellular phones when the calls were made.

Defendant asserts that this evidence was not based on scientific techniques generally accepted in the relevant scientific community under the *Kelly/Frye* test.[20]

---

[19] This corresponds with Jose and the children going to the victim's home, just before they discovered her body on the evening of November 5.

[20] *Kelly, supra*, 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013.

The California test and associated rules are now more appropriately referred to by reference to *Kelly*. (*People v. Bolden* (2002) 29 Cal.4th 515, 545 ["Until 1993, this rule was generally known in this state as the *Kelly-Frye* rule," but "our state law rule is now referred to simply as the *Kelly* test or rule"].) Accordingly, we will not refer to *Frye* except where mentioned in previous cases.

Specifically, defendant asserts this case involved two novel scientific techniques subject to *Kelly*: (1) "the whole process of estimating location based on cell tower data" and (2) more specific to this case, "the algorithm that produced the video shown to the jury, purporting to show the locations of various people at given times."[21] Defendant also asserts that Garbutt was not qualified to offer this evidence, and that cell phone tracking by historical cell phone data does not meet the foundational requirements under sections 801/802. Defendant also asserts that the trial court's error in admitting this evidence deprived him of his due process rights, and that it was prejudicial under any standard. And he asserts that, inasmuch as counsel failed to make proper objections, he was deprived of the effective assistance of counsel.

### 2. *Kelly* Principles

"Under the *Kelly/Frye* (or simply *Kelly*) inquiry applicable in California courts, 'when faced with a novel method of [scientific] proof, [courts] have required a preliminary showing of general acceptance of the new technique in the relevant scientific community' before the scientific evidence may be admitted at trial. [Citations.] The *Kelly* 'approach is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831, fn. omitted (*Daveggio and Michaud*).) Under the *Kelly* test, "the proponent of such evidence must establish (1) the new methodology is reliable by showing it has gained general acceptance in the relevant scientific community; (2) the witness furnishing the testimony is qualified as an expert to give an opinion on the subject; and (3) correct scientific procedures were used in the

---

[21] We note defendant occasionally refers to this testimony as establishing the "locations of various people" and whether the technology involved is "a scientifically accepted method of tracking people's movements." All of this evidence related to the general locations of cell phones within cell tower coverage areas, not the specific locations of phones or people.

particular case." (*People v. Garlinger* (2016) 247 Cal.App.4th 1185, 1194 (*Garlinger*), citing *Kelly, supra*, 17 Cal.3d at p. 30.) "However, as our Supreme Court has explained, this test 'is applicable only to "new scientific techniques," ' that is, ' "to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law." ' " (*Garlinger*, at p. 1194, quoting *People v. Leahy* (1994) 8 Cal.4th 587, 605 (*Leahy*) & *People v. Stoll* (1989) 49 Cal.3d 1136, 1155, 1156.)[22] Assuming the technique is new, the question of whether it has achieved general acceptance in the scientific community poses a mixed question of law and fact. (*People v. Stevey* (2012) 209 Cal.App.4th 1400, 1411; *People v. Reilly* (1987) 196 Cal.App.3d 1127, 1136 (*Reilly*).)

### 3. Forfeiture, Ineffective Assistance of Counsel, and Whether to Reach the Merits of Defendant's *Kelly* and Sections 801/802 Claims

As noted, following his voir dire of Garbutt, defense counsel stated: "I am prepared to object to his testimony." He stated no grounds for the objection. Defendant acknowledges that his trial counsel did not object on *Kelly* grounds or to the "underlying scientific foundation of the cell tower evidence." Nor did trial counsel state as specific grounds for his objection sections 801/802, Garbutt's qualifications as an expert, or the foundation for his opinions.

As our high court recently stated: "Ordinarily, 'the failure to object to the admission of expert testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted.' [Citations.] ' "The reason for the [objection]

---

[22] "In federal courts, *Frye* has been superseded by the standard articulated in" *Daubert v. Merrell Dow Pharms., Inc.* (1993) 509 U.S. 579, 589-598 [125 L.Ed.2d 469] (*Daubert*). (*Daveggio and Michaud, supra*, 4 Cal.5th at p. 831, fn. 7.) "Under *Daubert*, while '[w]idespread acceptance can be an important factor in ruling particular evidence admissible,' general acceptance is not 'an absolute prerequisite to admissibility.' " (*Ibid.*) "Notwithstanding *Daubert, Kelly/Frye* remains the law of California." (*Ibid.*, citing *Leahy, supra*, 8 Cal.4th at p. 591.)

requirement is manifest:  a specifically grounded objection to a defined body of evidence serves to prevent error.  It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice.  It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal." ' "  (*People v. Perez* (2020) 9 Cal.5th 1, 7 (*Perez*).)  Acknowledging the forfeiture of his *Kelly* claim, defendant asserts that the failure to make appropriate objections deprived him of constitutionally effective assistance of counsel.

Defendant acknowledges that in applying *Kelly*, "a trial court holds a pre-trial in limine hearing in which expert witnesses for both sides testify regarding the reliability of the scientific test at issue."  A trial court can also consider articles, studies, and research relevant to general acceptance.  (*People v. Shirley* (1982) 31 Cal.3d 18, 56.)  Such writings, in this context, are viewed "as 'evidence,' not of the actual reliability of the new scientific technique, but of its acceptance *vel non* in the scientific community."  (*Ibid.*)

In his appellate briefing, defendant does not rely upon testimony concerning general acceptance; there was none as a result of his failure to make a *Kelly* objection.  Instead, he relies upon several publications in advancing his argument that the type of cell tower coverage evidence at issue here is, in the words of one of the works on which he relies, "junk science," i.e., not generally accepted in the scientific community.[23]  We

---

[23] Defendant cites the following publications in his briefing:  Blank, Aaron. *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone* (Fall 2011) Richmond Journal of Law & Technology, Vol. XVIII, Issue 1; Cherry, Michael, et al., *Cell Tower Junk Science* (Jan./Feb. 2012) Judicature, Vol. 95, No. 4; Fishman, Clifford S. & McKenna, Anne T. *Wiretapping & Eavesdropping: Surveillance in the Internet Age*, §§29:35, 29:38 (2011); Grimm, Hon. Paul W. *Admissibility of Historical Cell Phone Location Evidence* (Summer 2018) Litigation, Vol. 44, No. 4; Hansen, Mark. *Prosecutors' Use of Mobile Phone Tracking Is "Junk Science," Critics Say* (June 2013) ABA Journal 97; Imwinkelried & Faigman, *Evidence Code Section 802: The Neglected Key to Rationalizing the California Law of*

acknowledge that an appellate court may consider such materials, even if not provided in the trial court, when there has been *Kelly* proceeding in the trial court. (See *Reilly, supra*, 196 Cal.App.3d at pp. 1134-1135 [noting that "the reviewing court undertakes a more searching review—one that is sometimes not confined to the record," thus allowing for consideration of scholarly writings bearing on the question of general acceptance not presented in the trial court].) But here, there was no hearing in the trial court because no *Kelly* motion was made. Ruling on the merits of *Kelly* and sections 801/802 objections in the context of an ineffective assistance of counsel claim where there has been no hearing in the trial court on those issues would facilitate an end run around the forfeiture rule. Again, the purposes of requiring a specifically grounded objection are to give the trial court an opportunity to make an informed decision to avoid prejudice, create a record for appellate review, and give the proponent of the evidence the opportunity to lay additional foundation or take other steps designed to minimize the prospect of reversal. (*Perez supra*, 9 Cal.5th at p. 7; *People v. Pearson* (2013) 56 Cal.4th 393, 438; *People v. Morris* (1991) 53 Cal.3d 152; *People v. Davis* (2008) 168 Cal.App.4th 617, 627.) " '[I]t is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial.' " (*Davis*, at p. 627, quoting 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 394, pp. 444-445.)

Were defendant to have made a *Kelly* objection at trial, the prosecution would have had the opportunity to challenge whether the techniques are new and make the showings required by *Kelly* (and the reliability showings required by sections 801/802) by presenting testimony and other materials pertinent to the *Kelly* analysis and the technology involved. For example, the prosecution could have presented additional

---

*Expert Testimony* (2009) 42 Loyola L.A. L. Rev. 427; McQuilkin, Andrew. *Sleeping Gate-Keepers: Challenging The Admissibility of Cell-Phone Forensic Evidence Under Daubert* (2011) 11 J. High Tech. L. 365; Minor, John B. *Litigator's Guide To Simplified Cellular Site Working Range Estimation Issues*.

evidence detailing the nature of the technique involved here and the science behind it. It could have called someone from ZetX to testify about the specific information it uses from the cellular providers, the algorithm used in the TraX program, and more detail about the video mapping. Additionally, the prosecution could have presented testimony from representatives of the various cellular providers concerning the technology and the specific information they provided that Garbutt ultimately downloaded into TraX. And the prosecution could have also presented testimony from scientists or engineers holding opposing views from those expressed in the articles defendant submits to us on appeal. Indeed, as the *Kelly* court noted, "[i]deally, resolution of the general acceptance issue *would require consideration of the views of a typical cross-section* of the scientific community." (*Kelly*, *supra*, 17 Cal.3d at p. 37, italics added.) All of this would have then been part of the appellate record and we could delve into it to determine the merits of defendant's objections.[24]

However, because defendant did not make the objection, he essentially asks us to forgo "consideration of the views of a typical *cross-section* of the scientific community" (*Kelly*, *supra*, 17 Cal.3d at p. 37), engage instead in a one-sided *Kelly* analysis grounded solely on materials he did not present in the trial court and reverse his conviction

---

[24] Defendant's failure to object in the trial court makes an analysis particularly problematic given the nature of the record here. Garbutt's testimony on exactly what TraX does was not clear. Does it calculate or otherwise determine what the coverage areas were for cell towers or does it merely depict the coverage areas based on coverage area information provided by cellular providers? The difference seems critical for purposes of *Kelly*. If it merely converts coverage data furnished by cellular providers (that they collect and maintain for their own business purposes) into a visual display on a map, then the argument that *Kelly* applies is not compelling. But if the program actually calculates or otherwise determines the coverage areas, then there is perhaps an argument that *Kelly* is implicated. Had there been a *Kelly* objection and a hearing in which testimony was given providing a full explanation of the data downloaded into TraX and how the program works, the record on this matter would be clear.

grounded on ineffective assistance of counsel.  The United States Supreme Court has stated that the standard for establishing ineffective assistance of counsel "must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve" *because such claims "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial.*"  (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), italics added.)  Accordingly, we decline to reach the merits of defendant's *Kelly* and section 801/802 objections made for the first time on appeal in deciding whether trial counsel was deficient in his performance.  Indeed, we need not do so to address defendant's claim of ineffective assistance of counsel because even if we were to conclude trial counsel's performance was deficient for not making a *Kelly* or section 801/802 objection, defendant has not shown prejudice.

### 4. Ineffective Assistance of Counsel Standards

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367 (*Rogers*).)  " 'Surmounting *Strickland*'s high bar is never an easy task.' "  (*Richter, supra,* 562 U.S. at p. 105, quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)  And it is well-settled that it is the defendant who bears the burden of proving ineffective assistance of counsel. (*People v. Haskett* (1990) 52 Cal.3d 210, 248; *People v. Camino* (2010) 188 Cal.App.4th 1359, 1377; *People v. Butler* (1995) 36 Cal.App.4th 455, 461.)

### 5. Prejudice

"[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry

if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.)

To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) "*The likelihood of a different result must be substantial*, not just conceivable." (*Richter, supra*, 562 U.S. at p. 112, italics added; *Rogers, supra*, 245 Cal.App.4th at p. 1367; *People v. Jacobs* (2013) 220 Cal.App.4th 67, 75; *In re M.P.* (2013) 217 Cal.App.4th 441, 457, fn. 10.) Stated slightly differently, a "defendant must prove prejudice that is a ' "demonstrable reality," not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241, italics added.)[25]

In his arguments addressing prejudice, defendant essentially asserts it is, at the very least, reasonably probable that he would have achieved a different result at trial in the absence of the cell tower coverage evidence. He does not go into any evidentiary

---

[25] Defendant relies on *People v. Howard* (1987) 190 Cal.App.3d 41, 48 (*Howard*), stating that, "[i]n statistical terms, *Strickland* requires a something less than 50 percent likelihood of a more favorable verdict." No published case has cited or followed *Howard* for this premise, and based on the more current statements describing prejudice by the United States Supreme Court and other courts of review, we decline to employ *Howard*'s mathematical formulation.

detail in making his prejudice argument, though he does make the unsubstantiated claim that the cell phone evidence was "highly inflammatory."

We conclude defendant has not established prejudice. This is because defendant's whereabouts on November 2 and the fact that he killed the victim were clearly established by evidence other than the cell phone tower coverage evidence.

The victim did not show up for work as scheduled and did not call in. Defendant was the victim's boyfriend and fiancé at the time of her death. In the hours leading up to the last time the victim communicated with anyone, and the last time she was heard from before her body was discovered on November 5, defendant and the victim engaged in an extremely rancorous, antagonistic text message exchange focused on, among other things, defendant's doubts about the victim's fidelity.

Additionally, defendant demonstrated jealously, expressing concerns that family members and Billy were having sex with or interested in the victim. On November 2, Johnny saw defendant outside of Maricela's house standing by Pat's car on the phone apparently arguing with the victim. Johnny overheard some of the conversation and defendant sounded upset. Referring to the victim by name, Johnny heard defendant say, " 'you want me to fucking -- you really want me to? You want me to? Okay. Watch. You want me to?' "

According to David, Pete, and Johnny, defendant admitted killing the victim on the night of November 2. That night, when David asked defendant what was going on, defendant responded, " 'I smacked my bitch,' " and held up his right hand in the shape of a gun. David testified that the term "smack" is used by Norteños to mean "kill someone," and he further testified that he knew defendant was a Norteño. According to Johnny, David told him, " 'I think [defendant] killed [the victim].' "

Johnny testified defendant said he had the victim get undressed and when she pulled down her underwear, "there was, like, stuff on it like she had just cheated. So he said that when he seen that, he said he couldn't take it. He shot her in the head, boom.

40

And then he got out of there." Johnny further testified that defendant stated: "She fucked somebody else, and she was late to meet him, and then when she pulled down her panties, she was all wet, and it was hella -- and he said he felt at that moment it was the perfect time to shoot her." Defendant also said that, when he went back to the apartment, the victim had made it from the back room to the front room. She had lived. So he finished her off.

In his statements during his interview with detectives, Pete told them defendant "said that he had followed [the victim] into her apartment so she didn't have no time to take a shower or nothing like that. And he said that . . . she didn't have no time to take a shower and he hadn't been with her for a while, but he said that she said, he told me that there was stains on her underwear from someone that she was with." Pete later told the detectives that the victim "was pushin' [defendant's] buttons." Pete continued: "She was pushin' his buttons. He couldn't take that shit and she thought he was playin' around, so he popped her." According to Papineau, when Pete said defendant popped the victim, Pete made a hand gesture simulating a gun. Pete then stated: "see it on the news and I'm, like, 'Oh, fuck. He wasn't playin'. He fuckin' really did.' " Detective Bearor asked Pete if he heard something more, and Pete responded, "That he tried to ride back over there?"

Papineau testified that both Johnny and Pete separately told him that defendant confessed to killing or shooting the victim. Johnny and Pete also independently indicated that defendant had later returned to the victim's apartment.

Billy testified that, at some point on Monday, November 3, Maricela told him that she thought defendant was in big trouble because he may have shot someone. Billy also said that about a month before the victim was murdered, defendant had threatened to kill her, although at the time Billy did not take the threat seriously.

The victim's body was found in a manner consistent with the accounts of defendant's admissions. She was found in the hallway. Based on the blood stains, she

41

apparently had made her way there from the bed where she was shot. She was naked from the waist down. Her yoga pants and underwear were found nearby in the doorway to the bathroom, in a condition which made it appear they had been taken off together.

After 9:48 p.m. on November 2, there were no outgoing calls placed from the phone the victim was using. Additionally, despite regular communication between the victim's and defendant's cell phones prior to November 2, thereafter, defendant's cell phone account terminated as of November 3, and he did not communicate with the victim's cell phone using the blue flip phone he had borrowed. Moreover, after November 2, at 9:33 p.m., there were no text messages or voice calls exchanged between Pat's phone and the phone the victim was using, although they had been in regular communication with each other before that.

There was, however, a flurry of call activity among phones associated with defendant and his family members following defendant's return from the victim's apartment on the night of November 2. After he returned to Pete and Pat's house, defendant, his family members, and associates placed and/or received no fewer than 45 calls between 11:21 p.m. and 5:37 a.m. on November 3. (See fn. 12, *ante*.) Defendant does not challenge the admissibility of this cell phone evidence.

There were no indications that anything was taken from the victim's apartment. Valuable items remained in the apartment, suggesting that theft was not a motive for the killing.

The physical evidence indicated that the victim was shot while on her bed. The bullet that killed her could have been fired from a .40-caliber handgun. Johnny testified that he had seen defendant carry around a .40-caliber handgun.

According to the victim's daughter, she unlocked the door when she came to the apartment and discovered the victim's body. This suggests the assailant had a key. And while the victim's daughter testified that, on Saturday, November 1, defendant returned an apartment key to the victim, the victim and defendant exchanged text messages the

42

following day, November 2, indicating defendant had taken some keys (plural) and had them in his possession.  At 3:41 a.m., defendant texted the victim, "But I guess you got rid of the kids for someone else to fuck you" followed by "Thats why I took ur *keys*!"  (Italics added.)  At 3:44, the victim texted defendant, "U took my *keys* !  You are so wrong."  (Italics added.)  At 4:06 a.m., the victim texted defendant, "Lol  you had to steal the *keys*.  That's how low u got."  (Italics added.)

After the victim was killed, defendant fled to Mexico, violating the terms of his supervised formal probation conditions.  Four months passed between the victim's death and when defendant was located by law enforcement in Mexico.  Defendant's flight evinced consciousness of guilt.

Regarding the evidence related to cell tower coverage areas, other evidence independently established that defendant was at Pat's on Sunday, November 2, that he then went to Maricela's, and that later he went to the victim's apartment.  At 6:09 p.m., defendant texted the victim, " 'I'm on my way.' "  At 6:11 p.m., defendant texted the victim, "You want me to put effort, well I'm about to."  Billy drove defendant to the victim's apartment on Sunday night.  Later that night, Pat received a call from defendant and she could hear the victim in the background.  Defendant asked Pat to have someone pick him up.  At Pat's request, Pete and Levy picked defendant up at the victim's apartment complex and brought him back to Pat's house.  Thus, what defendant hyperbolically characterizes as the "highly inflammatory" cell phone tower coverage evidence, the likely impact of which was "frankly immeasurable," actually furnished nothing more than corroboration of matters established through other evidence.

As defendant acknowledges in his briefing, the defense theory at trial was that the victim was alive after Sunday, November 2 — when the bulk of the cell phone calls about which Garbutt testified were made — and that it was Johnny who killed her.  The jury heard evidence relevant to Johnny's confessions to Christina.  The jury also heard Johnny deny killing the victim and explain his reasons for crafting false confessions.

43

More importantly, the evidence demonstrated that Johnny's account was inconsistent with the crime scene in a number of ways. The victim was not shot in the face, but rather was shot behind her left ear. She was not standing when she was shot, but rather was shot on the bed in her bedroom with her head near a pillow where a bullet hole, embedded hair, and a large bloodstain was found. There was no forensic evidence consistent with Johnny's statement that he stood on the victim's neck. Dr. Tovar testified that he did not note any fractures in the victim's neck. He found no indication that anyone had stomped on her neck or "stepp[ed] on her neck and put[] their weight down to crush her neck." Johnny mentioned nothing of any ligature, yet there were three. Underwear was not discovered in a trash can as Johnny had said. There was no evidence that supported the claim that the victim prostituted Johnny's wife. And the jury heard evidence concerning law enforcement's stance that Johnny was a "hot mess" and his claims required corroboration.

In light of the foregoing evidence, we conclude there is no reasonable probability that defendant would have received a more favorable result had counsel successfully objected on *Kelly* or sections 801/802 grounds to Garbutt's testimony concerning the TraX mapping addressing the general location of cell phones at the time they made or received calls. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) Thus, defendant was not prejudiced as a result. Consequently, his ineffective assistance of counsel claim fails.

**C. Hearsay and Confrontation Clause Objections to the ZetX Evidence**

**1. Additional Background**

At a break, during Garbutt's testimony, defense counsel, made his second objection. For the first time, he stated specific grounds, stating: "I had an objection that I made at sidebar, and that was with regards to Mr. Garbutt's presentation of the ranges, of

these lobes that are shown on the video.[26]  They depict the approximate range of these towers as determined by ZetX, the company, through an algorithm, but these lobes that are out there are opinions.  [¶]  So I realize that an expert can base their opinion on hearsay, but they're, essentially, based -- they're basing -- one of the ultimate opinions of the range on somebody else's opinion, and I have no ability to cross-examine ZetX.  So that's the basis of my -- it's a hearsay objection, and I would throw in the confrontation clause."

The court ruled:  "And that objection is noted, and I think a foundation has been established that this is the type of information upon which an expert with these qualifications can rely on formulating his findings, opinions, and conclusions, and that's the basis for my overruling your objection."

## 2. Defendant's Contentions

Defendant asserts on appeal that the ZetX video evidence was hearsay, the trial court erred in admitting it, and its admission violated his right to confrontation under the Sixth Amendment.  Defendant emphasizes that Garbutt did not estimate the location of the phones.  Instead, he entered data into a computer program to make the estimations.  As defendant puts it in his briefing, "the visual mapping of the cell tower estimations prepared by the 'algorithm' amounted to data analysis prepared by a third party who was not present for cross examination."  This evidence, according to defendant, contained multiple layers of hearsay and the "statements" represented by this evidence were being admitted for their truth, and that makes it inadmissible under *People v. Sanchez* (2016) 63

---

[26] Garbutt testified that the coverage area is demarked on the Google Map by what he referred to as a "brain symbol" (presumably because of the shape of the color-coded coverage areas) and different areas within that symbol are called "lobes."  Garbutt did not actually testify phones were within specific "lobes," but rather they were within the general color-coded area. The reporter's transcript indicates the sidebar counsel referenced was held six pages into the direct examination of Garbutt concerning the ZetX program and Garbutt's description of coverage areas.

45

Cal.4th 665 (*Sanchez*). Defendant further asserts the evidence was not admissible as demonstrative evidence because the evidence was not used merely to demonstrate Garbutt's opinions or conclusions, but was instead substantive evidence.

### 3. Harmless Error

Even if the trial court erred in admitting the video mapping on hearsay grounds, any such error was harmless. The admission of nontestimonial hearsay is a state law error, which is assessed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619.) " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Id.* at p. 956.)

"Confrontation clause violations are subject to federal harmless-error analysis under" *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*). (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159; *People v. Geier* (2007) 41 Cal.4th 555, 608 (*Geier*); see *Sanchez, supra*, 63 Cal.4th at pp. 670-671, 698 [assessing prejudice resulting from admission of testimonial hearsay under *Chapman*].) Since *Chapman*, our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*Geier*, at p. 608; accord, *People v. Aledamat* (2019) 8 Cal.5th 1, 3.) "The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty

46

absent the error?' " (*Geier*, at p. 608; *People v. Livingston*, at p. 1159.) To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671, citing *People v. Aranda* (2012) 55 Cal.4th 342, 367.)

In light of the evidence discussed in connection with defendant's ineffective assistance of counsel claim *ante*, we conclude that, even if it was error to admit the video mapping evidence over defendant's hearsay objection, any such error is harmless under both the *Watson* and *Chapman* standards.

## II. Evidence of Gang Affiliation, Witnesses' Beliefs that Defendant Had Killed Two People, and Text Message Containing Racial Slur

### A. Defendant's Contentions

Defendant asserts that the trial court erred in admitting evidence about his gang affiliation, testimony from Pete and Johnny that they believed defendant had previously killed two people, and evidence of defendant's use of a racial slur in a text message he sent to Jose. Defendant asserts that this evidence was highly prejudicial and inflammatory, and "had almost no probative value." We disagree.

### B. Relevance, Standard of Review, and Evidence Code Section 352

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) A trial court abuses its discretion when its ruling " ' "falls outside the bounds of reason," ' " or where the trial court " ' "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage

47

of justice." ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 663, quoting, parenthetically, *People v. Osband* (1996) 13 Cal.4th 622, 666 & *People v. Carrington* (2009) 47 Cal.4th 145, 195.)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "Evidence is not inadmissible under [Evidence Code] section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights. Our high court has emphasized the word 'substantial' in [Evidence Code] section 352. [Citations.] [¶] Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168 (*Holford*).)

### C. Evidence Defendant Was a Norteño

#### 1. Procedural Background

In his in limine motions, defendant moved to exclude evidence of his association with a criminal street gang. Defendant emphasized that the prosecution did not allege that he committed the murder for the benefit of or in association with a criminal street gang. Defendant asserted that his gang affiliation would not be relevant to any material issue in dispute at trial, and any probative value of the evidence would be substantially outweighed by the danger of undue prejudice. (Evid. Code, § 352.) He further asserted the evidence would amount to inadmissible character evidence precluded by Evidence Code section 1101, subdivision (a). Defendant also objected to the admission of the evidence on federal due process grounds based on his right to a fair trial.

48

The prosecution responded that it intended to call David, who would testify that defendant said that he " 'smacked [his] bitch.' " David would clarify that "smack" is a common term among Norteño members "which means to kill someone and that the defendant is a made member of the Nuestra Familia Hispanic prison gang." The prosecution maintained that it had to present evidence of defendant's ties to the Norteños and Nuestra Familia to corroborate and provide context for what defendant meant when he invoked the term "smack." The prosecution specified that it did not intend to call a gang expert to validate defendant or to go into a lengthy summary of defendant's gang membership.

The trial court overruled defendant's objection.

## 2. Trial Testimony

At trial, David testified that, in the garage on the night of November 2, he asked defendant what was going on, and defendant responded, " 'I smacked my bitch.' " When defendant said " 'I smacked my bitch,' " defendant held up his right hand with his thumb up and his index finger and middle finger pointing in the shape of a gun. David testified that the term "smack" is used by Norteños to mean "kill someone." David also testified that he knew defendant was a Norteño.

## 3. Analysis

Defendant asserts that the testimony that he was a Norteño should have been excluded because it was not relevant to any disputed fact of consequence. He correctly asserts that, "[i]n cases *not* involving the gang enhancement, . . . evidence of gang membership is potentially prejudicial and should not be admitted *if its probative value is minimal*." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*), some italics added.) Defendant acknowledges that this evidence was admitted to prove a particular point — that the word "smacked" in the context in which defendant allegedly said it to David meant "killed." However, defendant also emphasizes that, when David testified about this exchange, he also "made a gesture with his hand like shooting a gun," and

49

therefore asserts that the testimony that "smacked" was a Norteño term and that defendant was a Norteño was "unnecessary and gratuitous." He further asserts that even if this evidence was relevant, it should have been excluded based on an Evidence Code section 352 balancing analysis.

Contrary to defendant's contentions, David's testimony was not minimally probative (see *Hernandez, supra*, 33 Cal.4th at p. 1049), but rather was highly probative. This testimony explained what defendant meant in making the remarks he made to David. Defendant confessed to David that he killed the victim, not that he merely struck her as the term "smacked" might be commonly understood. This testimony, taken as a whole, had a tendency in reason to prove defendant killed the victim as charged. As the Attorney General asserts, this evidence was relevant to prove the identity of the victim's killer (Evid. Code, § 1101, subd. (b)), inasmuch as it had some tendency in reason to prove that defendant was indeed the person who killed her (Evid. Code, § 210). Moreover, unlike the hand gesture by itself, the testimony of what defendant said, what he meant, and how David understood what defendant meant, was unequivocal and clear. Indeed, it was not self-evident merely from the hand gesture alone that defendant had pulled the trigger, or if he did, that he had killed the victim. We conclude that the evidence was relevant and highly probative.

Turning to Evidence Code section 352, we further conclude that the high probative value of the evidence was not substantially outweighed by the probability that its admission would necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. Obviously, the introduction of this evidence consumed very little time. It presented no danger of confusing the issues or misleading the jury. The only Evidence Code section 352 counterweight arguably implicated here is the potential for undue prejudice.

" ' "Evidence is prejudicial within the meaning of Evidence Code section 352 if it ' "uniquely tends to evoke an emotional bias against a party as an individual" ' [citation]

50

or if it would cause the jury to ' " 'prejudg[e]' a person or cause on the basis of extraneous factors" ' " ' " (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 246 (*Hendrix*).) The evidence that defendant was a Norteño did have some potential for prejudice. However, the reference was brief, isolated, not explored further, and was not emphasized in argument. The prosecutor used the word "Norteno" once in argument, just to say that "smacked" was a "common term used by Nortenos to mean to kill somebody."

In light of the significant probative value and the minimal emphasis placed on this evidence, we conclude that the probative value of the evidence was not " 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice . . . ." (*Holford, supra*, 203 Cal.App.4th at p. 167.) We conclude that the trial court did not abuse its " ' "broad discretion" ' " in admitting this evidence over defendant's Evidence Code section 352 objection. (*Holford*, at pp. 167-168.)

### D. Pete's and Johnny's Beliefs that Defendant Had Killed Two People

#### 1. Background

Pursuant to Evidence Code section 780, which addresses factors that may be considered in judging the credibility of witnesses, the prosecutor sought to admit evidence that Johnny and Pete were fearful of defendant and the basis for that fear. The prosecutor maintained that evidence that a witness is afraid to testify or fears retaliation is relevant to the witness's credibility and admissible. One of the bases for these witnesses' fear of defendant was their belief that defendant had previously killed two people.

Defense counsel objected on, among other things, Evidence Code section 352 and 1101, subdivision (a) grounds. Defendant asserted that the prejudice was "manifest," asking how the jury could possibly hear that defendant caused the death of two others and decide the case on the merits. Defendant also raised due process and fair trial objections, as well as Sixth Amendment confrontation clause objections.

51

The trial court ruled that the probative value of this evidence outweighed the prejudicial effect. Both witnesses testified that they believed defendant killed two people in the 1990's.

## 2. Analysis

Defendant asserts the testimony was not relevant and it was highly prejudicial. He also asserts that the evidence was not relevant to any permissible purpose under Evidence Code section 1101, subdivision (b). While defendant acknowledges the purported rationale for the admission of this evidence — to show that the witnesses had recanted because they feared defendant — he further asserts that other, less prejudicial evidence was offered to show why the witnesses may have changed their testimony. Additionally, defendant asserts that the evidence was highly prejudicial under Evidence Code section 352.

Evidence Code section 1101, subdivision (a), provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Subdivision (b) of Evidence Code section 1101 provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act."

Here, the evidence that both Johnny and Pete believed that defendant killed two people in the 1990's was not offered to prove defendant's conduct on a specified occasion. Rather, it was offered as a reason for Pete's recantation and Johnny's statements shifting blame to himself.

"The categories listed in [Evidence Code] section 1101, subdivision (b), are examples of facts that legitimately may be proved by other-crimes evidence, but … the

52

list is not exclusive.' " (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1373 (*Spector*), quoting *People v. Catlin* (2001) 26 Cal.4th 81, 146.) "Hence, '[a]lthough evidence of prior offenses may not be introduced *solely* to prove criminal disposition or propensity such evidence may properly be admitted whenever it tends logically, naturally, and by reasonable inference to establish any fact material for the People or to overcome any material matter sought to be proved by the defense.' " (*Spector*, at p. 1373, quoting *People v. Montalvo* (1971) 4 Cal.3d 328, 331-332.)

Both Pete and Johnny, at various points, recanted statements they made to law enforcement implicating defendant in the killing of the victim. After giving his initial statement to police, Pete recanted, and further testified at trial that he could not remember making the statements he initially made to the detectives. He also testified that he got pressured by the detectives into saying things that were not true. After initially implicating defendant, Johnny subsequently made statements to a number of people saying that he killed the victim.

Pete's and Johnny's beliefs that defendant killed two people in the 1990's were relevant to explain reasons why they recanted their prior statements implicating defendant in the killing of the victim. This evidence " 'tend[ed] logically, naturally, and by reasonable inference to establish [a] fact material for the People or to overcome [a] material matter sought to be proved by the defense.' " (*People v. Montalvo, supra*, 4 Cal.3d at pp. 331-332; *Spector, supra*, 194 Cal.App.4th at p. 1373.) The testimony was relevant to explain these witnesses' fear of defendant and additionally, it was relevant to their credibility. (See Evid. Code, § 780.)

Pete, in his interview with the detectives, repeatedly expressed fear for his life as a result of what he was telling the detectives, although he did not identify with particularly the object of or basis for that fear. Johnny testified to having been afraid of defendant in the past but did not otherwise elaborate as to the reasons for that fear.

53

The evidence that Pete and Johnny believed defendant had killed two people in the 1990's had some potential for prejudice.  (See *Hendrix, supra*, 214 Cal.App.4th at p. 246 [discussing undue prejudice within the meaning of Evid. Code, § 352].)  However, the subject was only briefly touched upon and there was no further elaboration.  Moreover, the trial court instructed the jury:  "there was testimony by two witnesses that they believed that [defendant] had been responsible for killing two people in the past, and I instructed you with regard to one of those witnesses, and now I'm instructing you with regard to both of those witnesses; that that evidence is not to be considered by you for the truth of what is stated, but only as it may relate to that witness' state of mind and his attitude toward giving testimony in this case, and for no other purpose."  Additionally, the trial court instructed the jury:  "During the trial, certain evidence was admitted for a limited purpose.  You may consider that evidence only for that purpose and for no other." (CALCRIM No. 303.)  "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

In light of the probative value of this evidence, the minimal emphasis placed on this evidence, and the trial court's limiting instructions, we conclude that the probative value of the evidence was not " 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice . . . ." (*Holford, supra*, 203 Cal.App.4th at p. 167.)  The trial court did not abuse its discretion by allowing the testimony.

### E.  Racial Epithet

#### 1.  Background

In the middle of September 2014, Jose received a text message which the parties' stipulated was sent by defendant.  It read:  "I just gave your wife back her phone, so you can hit her up now.  I'm done with her.  I just found out she was fucking with some black fool from work, and I can't stand nigger-loving bitches.  So you can have that nasty ho back . . . ."

54

Defendant moved in limine to preclude the text message. He asserted, among other things, that the text message should be excluded under Evidence Code section 352 because any probative value was substantially outweighed by the danger of undue prejudice. Defendant asserted that the text message would inflame the jury and cast him in a prejudicial light. The trial court declined to redact the racial slur from the text message.

### 2. Analysis

Defendant asserts that the racial slur in the text message was not relevant to any contested issue, and served only to prejudice the jury against him. Defendant also asserts that, because he continued to have a dating relationship with the victim after sending the text message, it was not relevant to demonstrate a motive for the crime.

We agree with the Attorney General that defendant's text to Jose, including the racial slur he used, was relevant. It demonstrated defendant's animosity toward the victim, his jealousy and perceptions concerning her relationships, and his volatility in relation to these matters, all of which were relevant to defendant's motive in killing the victim. (See Evid. Code, § 210.)

Defendant asserts that, unlike *People v. Quartermain* (1997) 16 Cal.4th 600 (*Quartermain*), in which our high court determined the defendant's use of racial slurs *against the victim* were relevant and admissible, here, the racial slur was not directed at the victim. (*Id*. at pp. 627-629.) In *Quartermain*, our high court wrote: "The trial court did not abuse its discretion in refusing to exclude defendant's racial epithets. Contrary to defendant's conclusion, his use of the epithets was not irrelevant. [Citation.] Defendant used them to describe the victim specifically in two instances and to describe members of the victim's race generally in the third instance. As defendant puts it in his brief, these statements showed that he 'despised [the victim] and mocked [the victim] for the color of his skin.' Expressions of racial animus by a defendant towards the victim and the victim's race, like any other expression of enmity by an accused murderer towards the

55

victim, is relevant evidence in a murder or murder conspiracy case. Among other things, it is evidence of the defendant's prior attitude toward the victim, a relevant factor in deciding whether the murder was deliberate and premeditated because it goes to the defendant's motive." (*Id*. at p. 628.)

It is true that the racial slur here was not directed at or expressly about the victim. But we do not read *Quartermain* to hold that such evidence is relevant *only* in such circumstances. While the racial slur was not directed at or about the victim as such, it amply demonstrated defendant's animosity and volatility on matters pertaining to the victim and his perception of her fidelity. It expressed enmity toward her because of perceived infidelity involving a person of another race, which to defendant was apparently all the more reason to hate the victim. "A defendant is not entitled to have the jury determine his guilt or innocence on a false presentation that his and the victim's relationship was peaceful and friendly." (*People v. Fruits* (2016) 247 Cal.App.4th 188, 204; accord, *People v. McCray* (1997) 58 Cal.App.4th 159, 172; *People v. Zack* (1986) 184 Cal.App.3d 409, 415.)

Moreover, the trial court properly admitted this evidence over defendant's Evidence Code section 352 objection. Obviously, the presentation of this evidence did not consume an undue amount of time, and it did not pose any danger of confusing the issues or misleading the jury. We further conclude that the probative value of the evidence was not substantially outweighed by a substantial danger of undue prejudice. (Evid. Code, § 352.) "The unfortunate reality is that odious, racist language continues to be used by some persons at all levels of our society. While offensive, the use of such language by a defendant is regrettably not so unusual as to inevitably bias the jury against the defendant." (*Quartermain, supra*, 16 Cal.4th at p. 628.) The racial epithet was a single word in one text message of many presented to the jury. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the full text of the message, including the slur, over defendant's Evidence Code section 352 objection.

## F.  Prejudice

Even if it was error to admit any or all of the evidence discussed here, we would conclude that any such error was harmless under any standard.

Defendant asserts that the admission of the evidence addressed in this Discussion violated his right to due process, and therefore prejudice must be assessed under *Chapman, supra*, 386 U.S. at page 24.  And he asserts that even under the standard for state law error set forth in *Watson, supra*, 46 Cal.2d at page 836, these errors cannot be deemed harmless.  Among other things, defendant emphasizes that the prosecutor mentioned his status as a Norteño in closing, that the trial court did not give a limiting instruction concerning the gang evidence and the racial slur, and that, while the court did give a limiting instruction concerning prior bad acts, it is unrealistic to believe that such an instruction would be effective.

Given the other evidence in the case we discussed *ante*, we conclude there is no "reasonable possibility" that David's isolated testimony that defendant was a Norteño, Pete's and Johnny's brief testimony that they believed defendant killed two people in the 1990's, and the inclusion of the one racial slur in the text message defendant sent to Jose, individually or cumulatively, contributed to the verdict.  (*People v. Reese, supra*, 2 Cal.5th at p. 671; *People v. Aranda, supra*, 55 Cal.4th at p. 367.)  Accordingly, we conclude that any error was harmless beyond a reasonable doubt.  (*Chapman, supra*, 386 U.S. at p. 24; accord, *People v. Aledamat, supra*, 8 Cal.5th at p. 3; *Geier, supra*, 41 Cal.4th at p. 608.)

## III.  Johnny's Outbursts

## A.  Additional Background

During cross examination, Johnny said to defense counsel:  "You're defending a murderer, dude?  What's wrong with you?  Fuck."  Defense counsel stated, "Object.  Nonresponsive," and the trial court sustained the objection.  Defense counsel asked Johnny, "You're getting angry?" and Johnny responded, "Yes, I am getting angry.

There's a woman that's dead right now, and you're defending him." The court directed Johnny to "sit there and answer the questions."

As the prosecutor finished his redirect-examination, he showed a photograph of the victim to Johnny. The prosecutor asked, "Did you do that to her?" Johnny responded: "No, and I appreciate it if you do not show that to me." Johnny then stated, apparently to defendant: "You a piece of shit, nigger. You don't deserve nothing, nigger. You deserve to go to hell, bro." The court adjourned for a morning recess. The court told Johnny: "Get yourself together." The court asked if either attorney wished to make any statement for the record, and neither attorney did. Defense counsel did not make an objection, seek an admonition, or move for a mistrial.

In a colloquy after the close of all evidence, defense counsel stated: "The Court denied my request to admonish the jury to disregard the outburst of Johnny . . . , who, when shown a picture, it's my position and my argument that he made a nonresponsive statement that -- directed at my client, as opposed to information for the jury that my client essentially was responsible for this. He used a -- some derogatory language when he did that. [¶] My recollection of that event was the Court was already trying to make effort, body language and perhaps words, to shut [Johnny] down because he was having an outburst, and so I didn't feel the need to make an objection for the Court to take action, because action was being taken; but he was very emotional and yelling out. [¶] It's my understanding that [the prosecutor's] argument on that point was that it was evidence, and his reaction to that spoke to [Johnny's] believability, and I believe the Court denied my request to have that stricken and have the jury admonished to disregard it."

In his initial closing argument, the prosecutor had called attention to Johnny's outburst. After discussing many of the reasons the prosecutor asserted Johnny could not be the victim's killer, the prosecutor stated: "But I put it up there, and Johnny is up here on the witness stand, and he's sitting right here. And as you recall, his eyes get wide

58

open as he's looking at the picture.  And then he just looks at [defendant] and he unleashes on his uncle:  That's fucked up, nigger.  That's fucked up.  That's cold blooded, nigger.  [¶]  And he's screaming at the top of his lungs at [defendant], and that's exactly what he said.  [¶]  And then Johnny's face just turns beat [*sic*] red, and he puts his head in his hands and he's shaking uncontrollably.  He's sobbing like a baby.  He's sitting here, and he's just crying like a baby.  And he looks up at me and he yells at me:  If you're going to show me that picture, tell me about it.  [¶]  And he goes back to crying, and then he looks up and he says:  Is that her?  Is that [the victim]?  Is that her?  [¶]  If Johnny had killed [the victim], he wouldn't have to ask me that question.  He would know what she looked like after he killed her.  'Is that her?  Is that [the victim]?'  [¶]  There are moments in every trial that has the ring of truth and the aura of credibility.  In every case, there are moments like that, and that was one of those moments.  It was raw.  It was pure.  It was unadulterated, unfiltered emotion, and it was the truth.  If the truth was a real person with eyes and limbs, if the truth had a voice, a personality, a beating heart and a soul, the truth would be standing right there next to Johnny when that happened, and the truth would be telling you that Johnny is no murderer."

### B.  Defendant's Contentions

Defendant asserts that the trial court's failure to admonish the jury, give a limiting instruction, or declare a mistrial in the face of Johnny's outbursts deprived defendant of his right to due process and a fair trial.  Defendant asserts Johnny's outbursts undermined both defendant and defense counsel.  Defendant asserts that, because the trial court's failures deprived him of his constitutional right to a fair trial, it constituted a structural defect requiring reversal per se.  Even if the error did not rise to the level of structural error, defendant asserts that it cannot be deemed harmless under *Chapman* or *Watson*. Again, we disagree with defendant.

59

## C. Analysis

"It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (Pen. Code, § 1044.)

In a recent case, our high court stated: "Courts . . . retain broad power to control their courtrooms and protect a defendant's right to a fair trial. [Citations.] *But we have never held that a trial court must sua sponte admonish the jury to ignore a witness's emotional outbursts*. [Citations.] . . . [D]ue process did not compel a trial court to recognize and correct all instances of arguable prosecutorial misconduct. [Citation.] So too with a witness's emotional outbursts. [*The defendant*] *was represented at trial, so the responsibility fell to defense counsel to protest any objectionable testimony*. [Citation.] Indeed it is not inconceivable that, in certain circumstances, defense counsel would decide as a matter of strategy to allow a witness to engage in emotional outbursts, perhaps to undermine that witness's credibility. *Imposing a duty on trial courts to intervene in these situations risks unnecessarily enmeshing trial courts in choices best left to defense counsel*." (*People v. Reed* (2018) 4 Cal.5th 989, 1008-1009 (*Reed*), italics added.)

*Reed*, which defendant does not address in his appellate briefing, effectively disposes of defendant's contention. Obviously, we are bound to follow our high court's decision in *Reed*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456.) The trial court had no sua sponte duty to admonish the jury to disregard Johnny's outbursts, and it had no sua sponte duty to intervene in response to those outbursts. (*Reed, supra*, 4 Cal.5th at pp. 1008-1009.)

Moreover, we note defense counsel actually "opened the door" to one of these outbursts. It was only after defense counsel asked Johnny, "You're getting angry?" that Johnny responded, "Yes, I am getting angry. There's a woman that's dead right now, and

you're defending him." (2 RT 893) Defendant cannot complain about responsive testimony he purposefully elicited on cross-examination.

Additionally, we agree with the trial prosecutor and the Attorney General that Johnny's outbursts were relevant considerations for the jury. The outbursts were relevant to Johnny's credibility pursuant to Evidence Code section 780, which allows a jury to "consider in determining the credibility of a witness *any matter* that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, *including but not limited to* . . . : [¶] (a) His demeanor while testifying and the manner in which he testifies. [¶] . . . [¶] (b) The character of his testimony. [¶] . . . [¶] (j) His attitude toward the action in which he testifies or toward the giving of testimony." (Italics added.)

Based on all of the foregoing, we conclude that, contrary to defendant's contention, the trial court did not deprive defendant of his right to due process or a fair trial by not intervening to address Johnny's emotional outbursts.

## IV. Refusal to Give Third Party Culpability Instruction

### A. Additional Background

Defendant requested the court to instruct the jury with a pinpoint instruction on third party culpability. That proposed instruction read: "You have heard evidence that a person other than the defendant committed the offense with which the defendant is charged. The defendant is not required to prove the other person's guilt. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt. Therefore, the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt. Evidence that another person committed the charged offense may by itself leave you with a reasonable doubt as to the defendant's guilt. However, its weight and significance, if any, are matters for your determination. If after considering all of the evidence, including any evidence that another person committed the offense,

61

you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty."

The prosecution opposed the request, arguing that it was duplicative and argumentative. The trial court denied the defense's request. The court stated, "I believe that the instructions as drafted appropriately address the People's burden of proof and the presumption of innocence, and I don't believe that the proposed instruction would further aid the jury in their deliberations. [¶] I do believe that it is somewhat argumentative; and further, that it is in the nature of me, as the judge, commenting on the evidence, and it was just something that I generally choose not to do, as I believe that it creates the wrong impression to the jury in terms of what I think the evidence is, or what I think the facts are. And so I have declined to give that instruction for those reasons."

## B. Defendant's Contentions

Defendant asserts that the trial court erred in refusing to instruct the jury on third party culpability. He asserts that this deprived him of his right to present a defense and his right to due process and a fair trial. He further asserts that the instruction was supported by the law and evidence, and the trial court was required to give it upon request. The purported error, according to defendant, was a structural error warranting per se reversal. Even if the error did not rise to the level of structural error, defendant asserts that it cannot be deemed harmless under *Chapman* or *Watson*.

## C. Analysis

"A trial court has a sua sponte duty to 'instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case . . . .' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 845-846, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1219.) "Pinpoint instructions ' "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case." ' [Citation.] 'Upon proper request, a defendant has a right to an instruction pinpointing the theory of defense . . . if the theory proffered by the defendant is supported by substantial

62

evidence' [citation], the instruction is a correct statement of law [citation], and the proposed instruction does not simply highlight specific evidence the defendant wishes the jury to consider." (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1173-1174 (*Jo*).)  "The trial court may properly refuse an instruction highlighting a defense theory if it is 'duplicative or potentially confusing.'  [Citation.]  '[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused.'  [Citations.]  Put another way, '[t]here is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial.'  [Citation.]  The failure to give an instruction on even an essential issue 'may be cured if the essential material is covered by other correct instructions properly given.' "  (*Id*. at p. 1174.)

While the trial court here declined to instruct the jury with defendant's proposed pinpoint instruction, it did instruct the jury that defendant was presumed innocent and that the prosecution bore the burden of proving him guilty beyond a reasonable doubt.  The court instructed the jurors:  "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true.  You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.  A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People to prove a defendant guilty beyond a reasonable doubt.  [¶]  Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.  [¶]  Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt.  [¶]  In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence received throughout the entire trial.  Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."  (CALCRIM No. 220.)

In *People v. Hartsch* (2010) 49 Cal.4th 472 (*Hartsch*), the defendant proposed two instructions related to third party culpability. At the outset of its discussion of the pinpoint instructions requested by the defendant, the *Hartsch* court stated, "an examination of the proposed instructions reveals that most of them were either legally incorrect, unsupported by the evidence, duplicative, or argumentative." (*Id*. at p. 500.)

Proposed instruction I in *Hartsch* stated, in pertinent part: " 'If the evidence presented in this case convinces you beyond a reasonable doubt that the defendant is guilty, you should so find, even though you may believe that one or more other persons are also guilty. [¶] On the other hand, if you entertain a reasonable doubt of the defendant's guilt after an impartial consideration of the evidence presented in the case, including any evidence of the guilt of another person or persons, it is your duty to find the defendant not guilty.' " (*Hartsch, supra*, 49 Cal.4th at p. 504.) Our high court stated that this proposed instruction "simply restated the reasonable doubt standard in connection with the possibility that one or more others might be guilty parties." (*Ibid*.)

Proposed instruction Z stated: " 'Evidence has been presented during the course of this trial indicating or tending to prove that someone other than the defendant committed, or may have had a motive and opportunity to commit, the offense(s) charged. In this regard, it is not required that defendant prove this fact beyond a reasonable doubt. [¶] The weight and significance of such evidence are matters for your determination. If after consideration of all of the evidence presented, you have a reasonable doubt that the defendant committed the offense(s) charged, you must give the defendant the benefit of the doubt and find him not guilty.' " (*Hartsch, supra*, 49 Cal.4th at p. 504.)

Defendant's proposed instruction here was argumentative. It bears a strong similarity to the defendant's proposed instruction Z in *Hartsch*. The first sentence of instruction Z in *Hartsch* stated: " 'Evidence has been presented during the course of this trial indicating or tending to prove that someone other than the defendant committed, or may have had a motive and opportunity to commit, the offense(s) charged.' " (*Hartsch,*

*supra*, 49 Cal.4th at p. 504.) The *Hartsch* court concluded that this instruction was "unduly argumentative, because it *told* the jury that evidence 'indicat[ed] or tend[ed] to prove that someone other than the defendant committed, or may have had a motive and opportunity to commit, the offense(s) charged,' " and further stated that it "is improper for an instruction to indicate an opinion favorable to the defendant regarding the effect of the evidence." (*Ibid.*)

The beginning of defendant's proposed instruction is even more problematic in this regard. It stated: "*You have heard evidence that a person other than the defendant committed the offense* with which the defendant is charged." (Italics added.) The italicized language is far more argumentative than the instruction in *Hartsch*, inasmuch as it would have told the jury that there was evidence *that actually proved* someone else killed the victim, as opposed to the *Hartsch* instruction Z language which only referenced evidence which *indicated or tended to prove* that someone else committed the charged offenses *or may have had a motive and opportunity* to commit the charged offenses. (*Hartsch, supra*, 49 Cal.4th at p. 504.)

Additionally, defendant's proposed instruction was duplicative in much the way the second sentence of the *Hartsch* instruction Z was. As noted, the *Hartsch* instruction read: " 'In this regard, it is not required that defendant prove this fact beyond a reasonable doubt.' " (*Hartsch, supra*, 49 Cal.4th at p. 504.) The middle portion of defendant's proposed instruction was similar, stating: "The defendant is not required to prove the other person's guilt. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt. Therefore, the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt. Evidence that another person committed the charged offense may by itself leave you with a reasonable doubt as to the defendant's guilt." Both the *Hartsch* instruction and that proposed by defendant were duplicative of the reasonable doubt instruction, as they repeated the admonishment

that it is the prosecution that bears the burden of proving a defendant's guilt beyond a reasonable doubt.

Finally, proposed instruction Z in *Hartsch* ended: " 'The weight and significance of such evidence are matters for your determination. If after consideration of all of the evidence presented, you have a reasonable doubt that the defendant committed the offense(s) charged, you must give the defendant the benefit of the doubt and find him not guilty.' " (*Hartsch, supra*, 49 Cal.4th at p. 504.) Similarly, defendant's proposed instruction here ended with: "However, its weight and significance, if any, are matters for your determination. If after considering all of the evidence, including any evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty." These passages are almost identical. The substantive departure between the two is that, unlike proposed instruction Z in *Hartsch*, the proposed instruction here again returns to argument, discussing "any evidence that another person committed the offense."

It is clear that defendant's proposed instruction suffers from the same shortcomings as proposed instructions I, and particularly proposed instruction Z, in *Hartsch*. It adds little to the standard instruction on reasonable doubt and is redundant in that it restates that standard. Moreover, defendant's proposed instruction was unduly argumentative.

We conclude that the trial court properly declined to give the proposed pinpoint instruction. (*Hartsch, supra*, 49 Cal.4th at pp. 500, 504; see generally *People v. Moon* (2005) 37 Cal.4th 1, 30 ["a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence"].)

## D. Prejudice

Even if it were error for the court to deny defendant's request for the pinpoint instruction, the error was harmless under any standard.

Defendant's defense was largely premised on the theory that Johnny killed the victim and that she was alive and well beyond Sunday, November 2. But the evidence we have discussed *ante*, overwhelmingly established defendant's guilt and exculpated Johnny.

Moreover, in discussing the instructions in *Hartsch*, the court stated: "We have noted that similar instructions add little to the standard instruction on reasonable doubt. [Citation.] We have also held that even if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*Hartsch, supra*, 49 Cal.4th at p. 504.) Such is the case here as well.

The *Hartsch* court also stated: "The omission of this instruction, if error, could not have affected the verdict. It is hardly a difficult concept for the jury to grasp that acquittal is required if there is reasonable doubt as to whether someone else committed the charged crimes. The closing arguments focused the jury's attention on that point." (*Hartsch, supra*, 49 Cal.4th at p. 504.) The same is true here. The trial court's refusal to give the pinpoint instruction could not have affected the verdict. (See *Chapman, supra*, 386 U.S. at p. 24.)

### V. Amendment of the Information After the Jury Was Discharged

### A. Additional Background

On March 28, 2018, defendant waived jury trial on his prior conviction allegations. The information alleged defendant had been convicted of two counts of voluntary manslaughter on January 18, 1995. Prior to the trial on the priors, the prosecution moved to amend the information to reflect the correct date of April 24, 1995, for defendant's prior convictions. The defense objected to the amendment of the information after defendant waived jury trial and the jury was discharged. The trial court

67

concluded the amendments did not change the substance of the charges that were pending at the time defendant waived jury trial on his priors. Therefore, the court stated that it did not believe amendment would violate defendant's Sixth Amendment rights. The trial court granted the motion and the amended information was filed.

## B. Defendant's Contentions

Defendant asserts that the trial court erred in granting the prosecution's request to amend the information after the jury had been discharged. According to defendant, this error deprived him of his right to trial by jury on the prior conviction allegations. He asserts that, by allowing the amendments, the trial court violated Penal Code section 1025, subdivision (b) and acted in excess of its jurisdiction by altering an allegation in the information after the jury was discharged.

## C. Analysis

Penal Code, section 1025, subdivision (b) provides, in pertinent part: "the question of whether or not the defendant has suffered the prior conviction shall be tried by the jury that tries the issue upon the plea of not guilty . . . ." "A defendant does . . . have a statutory right to a jury trial on 'the question of whether or not the defendant has suffered the prior conviction'—though not 'whether the defendant is the person who has suffered the prior conviction.' " (*People v. Gallardo* (2017) 4 Cal.5th 120, 125, quoting Pen. Code, § 1025, subds. (b) & (c).)

Defendant relies heavily on *People v. Tindall* (2000) 24 Cal.4th 767 (*Tindall*). There, our high court stated: "[I]n the absence of a defendant's forfeiture or waiver, section 1025, subdivision (b) requires that the same jury that decided the issue of a defendant's guilt 'shall' also determine the truth of alleged prior convictions. Because a jury cannot determine the truth of the prior conviction allegations once it has been discharged [citation], it follows that the information may not be amended *to add prior conviction allegations* after the jury has been discharged. Thus, *under the circumstances of this case*, we find that the postdischarge amendment, which increased defendant's

68

prison sentence from four years to 25 years to life, was erroneous. The prejudice to defendant is manifest." (*Tindall*, at p. 782, italics added.)

*Tindall* and the other cases on which defendant relies involve amendment of the charging instrument to *add additional prior conviction allegations*. (See *People v. Gutierrez* (2001) 93 Cal.App.4th 15, 17, 19-24 (*Gutierrez*) [adding two Nevada priors]; *People v. Luick* (1972) 24 Cal.App.3d 555, 557-559 [adding five prior felony convictions].) That is not what happened here.

In *People v. LaVoie* (2018) 29 Cal.App.5th 875 (*LaVoie*), the court stated: "An exception for minor amendments follows from the reasoning in *Tindall*, as elaborated in *Gutierrez*." (*Id*. at p. 885.) Based on its reading of *Tindall* and *Gutierrez*, the court in *LaVoie* reasoned that, "when a defendant has waived a jury trial on prior conviction allegations, and when the prior conviction allegations are amended typographically and not substantially, the waiver remains binding." (*Ibid*.) The court also stated that "it is an overarching rule that '[n]o accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits.' " (*Id*. at p. 886, quoting Pen. Code, § 960.) The court then turned to the question "whether the amendments . . . were substantial, on the one hand, or minor, clerical, or typographical on the other hand." (*LaVoie*, at p. 886.) The *LaVoie* court stated that amendments to change the date and location of an alleged prior serious felony conviction and an alleged prison prior, which did not change the offense, were "minor." (*Ibid*.) The court further stated: the "[d]efendant does not claim and, on this record, cannot show that these amendments had a prejudicial effect on his defense, on his decision to waive a jury trial, on his decision to admit the priors, or otherwise." (*Ibid*.)

Here, the amendments only changed the date of the prior convictions. They did not change or add convictions, and they did not add anything substantive. Defendant asks us to depart from *LaVoie*. We agree with the court's reasoning in *LaVoie* and

69

choose to follow it.  The trial court's amendment of the priors to change their dates amounted to minor changes which did not prejudice defendant's substantial rights and his jury waiver remained binding.  (*LaVoie, supra*, 29 Cal.App.5th 875.)

## VI.  Oral Imposition of Fines and Fees

Though not raised by the parties, we note an issue with the imposition of fines and fees at sentencing.  The abstract of judgment indicates that, in addition to a $400 restitution fine pursuant to Penal Code section 1202.4, subdivision (b), a $400 parole revocation restitution fine pursuant to Penal Code section 1202.14, and victim restitution pursuant to Penal Code section 1202.4, subdivision (f), the trial court imposed a $40 court operations assessment pursuant to Penal Code section 1465.8 and a $30 criminal conviction assessment pursuant to Government Code section 70373.  However, the transcript of sentencing does not reflect that the trial court orally imposed the court operations assessment or the criminal conviction assessment at sentencing.

When a trial court fails to impose a statutorily mandated fine or fee, the sentence is unauthorized, and the appellate court may correct the error, even if the People failed to bring it to the trial court's attention.  (*People v. Smith* (2001) 24 Cal.4th 849, 852-853; *People v. Scott* (1994) 9 Cal.4th 331, 354.)  The court operations assessment and the criminal conviction assessment fee are mandatory.  (Pen. Code, § 1465.8; Gov. Code, § 70373; *People v. Woods* (2010) 191 Cal.App.4th 269, 272-273; *People v. Knightbent* (2010) 186 Cal.App.4th 1105, 1112.)  We will modify the oral pronouncement of judgment to include these fees.

## DISPOSITION

The oral pronouncement of judgment is modified to reflect the imposition of a $40 court operations assessment pursuant to Penal Code section 1465.8 and a $30 criminal conviction assessment pursuant to Government Code section 70373.  As modified, the judgment is affirmed.

/s/
MURRAY, J.*

We concur:


/s/
MAURO, Acting P. J.


/s/
RENNER, J.

---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.